1  HEATHER E. WILLIAMS (SBN 122664)
   Federal Defender
2  JAYA C. GUPTA (SBN 312138)
   Assistant Federal Defender
3  2300 Tulare Street, Suite 330
   Fresno, California 93721
4  Telephone: (559) 487-5561
   Facsimile: (559) 487-5950
5

6  Attorneys for Defendant
   EMIL VLADIMIROV BABADJOV
7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11  UNITED STATES OF AMERICA          )  No. 1:16-cr-00204-1-LJO
                                      )
12              Plaintiff,            )  SUPPLEMENT TO MOTION FOR
                                      )  COMPASSIONATE RELEASE PURSUANT
13          v.                        )  TO 18 U.S.C. § 3582(c)(1)(A)(i)
                                      )
14  EMIL VLADIMIROV BABADJOV,         )
                                      )
15              Defendant.            )
                                      )
16                                    )
                                      )
17                                    )
                                      )
18  _____  )

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARD.................................................................................................... 3

ARGUMENT ................................................................................................................ 4

   A.   Mr. Babadjov Has Satisfied the Exhaustion Requirements Set Forth in 18 U.S.C. § 3582(c)(1)(A). ........................................................................................................ 5

   B.   Mr. Babadjov's Vulnerability to COVID-19 Constitutes an "Extraordinary and Compelling Reason" Warranting Relief Pursuant to 18 U.S.C. § 3582(c)(1)(A)...................... 5

      1.   Mr. Babadjov Suffers from a Serious Medical Condition as His Obesity and History of Drug Use Pose a High Risk of Serious Illness and/or Death from COVID-19. .................... 7

      2.   The Conditions at USP Lompoc Significantly Diminish Mr. Babadjov's Ability to Provide Self-Care. .................................................................................................... 11

   C.   The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Babadjov's Prison Sentence to Time Served. .................................................................................... 19

CONCLUSION............................................................................................................ 23

1

**TABLE OF AUTHORITIES**

2

3

**Cases**

4

*Brown v. Mitchell*,
  327 F. Supp. 2d 615 (E.D. Va. July 28, 2004) ........................................................ 20

5

*Helling v. McKinney*,
  509 U.S. 25 (1993) ................................................................................................... 20

6

7

*United States v. Almontes*,
  No. 05-cr-58, 2020 WL 1812713 (D. Conn. Apr. 9, 2020) ....................................... 7

8

*United States v. Atkinson*,
  No. 19-cr-0055, 2020 WL 1904585 (D. Nev. Apr. 17, 2020) .................................. 16

9

10

*United States v. Burnside*,
  --- F.Supp.3d ---, 2020 WL 3443944 (N.D. Iowa, Jun. 18, 2020) ..................... 5, 11

11

*United States v. Common*,
  No. 17-cr-30067, 2020 WL 3412233 (C.D. Ill. June 22, 2020) ............................... 11

12

13

*United States v. Esparza*,
  No. 07-CR-00294-BLW, 2020 WL 1696084 (D. Idaho Apr. 7, 2020) ................... 16

14

*United States v. Fox*,
  No. 14-cr-03, 2019 WL 3046086 (D. Me. July 11, 2019) .......................................... 7

15

16

*United States v. Gorai*,
  No. 18-cr-00220-JCM, 2020 WL 1975372 (D. Nev. Apr. 24, 2020) .................. 1, 16

17

18

*United States v. Hird*,
  Case No. 2:13-cr-39-TJS, Dkt. No. 650 (E.D. Pa. May 19, 2020) .......................... 16

19

*United States v. Hunt*,
  No. 18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020) ...... 11

20

21

*United States v. Kesoyan*,
  No. 15-cr-0236-JAM, 2020 WL 2039028, (E.D. Cal., Apr. 28, 2020) ............ 5, 6, 19

22

23

*United States v. Mel*,
  No. 18-cr-0571-TDC, 2020 WL 2041674 (D. Md., Apr. 28, 2020) ........................ 21

24

*United States v. Millan*,
  No. 91-CR-685 (LAP), 2020 WL 1674058, (S.D.N.Y. Apr. 6, 2020) ...................... 3

25

26

*United States v. Robinson*,
  No. 18-cr-00597-RS, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020) ................... 1, 6

27

*United States v. Rodriguez*,
  __ F. Supp. 3d __, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) ............................... 6

28

*United States v. Rodriguez,*
424 F. Supp. 3d 674 (N.D. Cal. 2019) ...................................................................... 7

*United States v. Urkevich,*
No. 03-cr-37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) ...................................... 7

*Wallis v. Baldwin,*
70 F.3d 1074 (9th Cir. 1995) ................................................................................ 20

**Statutes**

18 U.S.C. § 3582 ...................................................................................... *passim*

21 U.S.C. § 841 .............................................................................................. 2

28 U.S.C. § 994(t) ......................................................................................... 3

**Other Authorities**

Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020),
https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/ ................................................................................... 12

Boston 25 News, *Young, middle-aged people hospitalized with coronavirus at high rates*, April 28, 2020, https://www.boston25news.com/news/health/young-middle-aged-people-hospitalized-with-coronavirus-high-rates/WLAIK65QEJGW3BN2M2NGZZROYQ/ (last accessed June 25, 2020). ................................................................................ 8

*Calculate Your Body Mass Index*, U.S. Dept. Health & Human Svcs., Nat'l Heart, Lung & Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited May 26, 2020) .................................................................................... 10

Carrico, A. W., Horvath, K. J., Grov, C., Moskowitz, J. T., Pahwa, S., Pallikkuth, S., & Hirshfield, S. (2020). *Double Jeopardy: Methamphetamine Use and HIV as Risk Factors for COVID-19*. AIDS and behavior, 1–4. Advance online publication.
https://doi.org/10.1007/s10461-020-02854-w .......................................................... 10

Chris Mooney, et al., *All across the United States, the coronavirus is killing more men than women, data show*, Washington Post (Apr. 4, 2020),
https://www.washingtonpost.com/health/2020/04/04/coronavirus-men/ ............................ 10

CNBC, *WHO says 'more and more' young people are dying from the coronavirus*,
https://www.cnbc.com/2020/04/03/who-says-more-and-more-young-people-are-dying-from-the-coronavirus.html (last accessed June 25, 2020) .................................................. 7

*Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html .......................................................................... 9

David Patton, *Statement from Federal Defenders of New York*, Federal Defenders of New York
(Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-
defenders-of-new-york.html ................................................................................................ 13

Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons'
Compassionate Release Program* (April 2013), at 11, available at
https://oig.justice.gov/reports/2013/e1306.pdf ...................................................................... 4

Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on
the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/
reports/2015/e1505.pdf#page=1 ............................................................................................. 4

Dr. Nora Volkow, *COVID-19: Potential Implications for Individuals with Substance Use
Disorders*, National Institute on Drug Abuse (Apr. 6, 2020),
https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-
individuals-substance-use-disorders .................................................................................. 9, 10

https://www.hopkinsguides.com/hopkins/view/Johns_Hopkins_ABX_Guide/540747/all/Coronav
irus_COVID_19__SARS_CoV_2_, last accessed June 25, 2020. ........................................ 8

*Inmate Death at the FCI Terminal Island*, Bureau of Prisons,
https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf (last visited June
23, 2020) ............................................................................................................................. 12

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional
and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-
correctional-detention.html .......................................................................................... 12, 15

Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047,
1047 (2007), https://doi.org/10.1086/521910 ..................................................................... 12

Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a
Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-
purell-is-contraband-how-can-prisons-contain-coronavirus ................................................ 13

Kimberly Kindy, et al., *These towns love their federal prison. But covid-19 is straining the
relationship*. Washington Post (May 9, 2020),
https://www.washingtonpost.com/national/these-towns-love-their-federal-prison-but-covid-19-
is-straining-the-relationship/2020/05/08/68e93702-9084-11ea-9e23-6914ee410a5f_story.html
.......................................................................................................................................... 18

Kristine Phillips, *Ex-Trump campaign chairman Paul Manafort released from prison amid
coronavirus pandemic*, USA TODAY, May 13, 2020,
https://www.usatoday.com/story/news/politics/2020/05/13/coronavirus-paul-manafort-
released-home-confinement-amid-covid-19/5181984002/ ..................................................... 3

Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*,
2011-12, Bureau Of Justice Statistics, NCJ 248491, 1 (Rev. Oct. 4, 2016),
https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf ....................................................... 13

Letter from Senator Charles Grassley et al. (Mar. 23, 2020), *available at* https://www.grassley.senate.gov/sites/default/files/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf .................................. 13

Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/ 815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators............................................................................................ 12

*People of Any Age with Underlying Medical Conditions*, Centers for Disease Control & Prevention (rev. June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity ...................... 9, 10

*Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, U.S. Dep't of Justice Office of the Inspector General (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf . 13

Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, Los Angeles Times (Apr. 16, 2020), https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected.............................. 17, 19

Richard Winton, *Inmate labeled as 'recovered' from coronavirus dies at Terminal Island*, Los Angeles Times (May 28, 2020), https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison ....................................................... 12

Roni Caryn Rabin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html ................ 8

Safiya Richardson, MD, MPH, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, Journal of the American Medical Ass'n (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184 .................................... 8

Shikha Garg, M.D., et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-Net, 14 States, March 1-30, 2020*, Morbidity and Mortality Weekly Report, Centers for Disease Control (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm#suggestedcitation ..................... 9

Stanton A. Glantz, Ph.D., *Reduce your risk of serious lung disease caused by corona virus by quitting smoking and vaping*, University of California, San Francisco, Center for Tobacco Control Research & Education (May 13, 2020), https://tobacco.ucsf.edu/reduce-your-risk-serious-lung-disease-caused-corona-virus-quitting-smoking-and-vaping.................................. 9

U.S. Dep't of Justice Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf ....................................................... 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Walter Pavlo, *Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers to Make Rulings*, FORBES (May 20, 2020), https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#34d2a14512c7 ............................................... 11

*What You Can Do*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html ............................................... 15

*When You Can be Around Others After You Had or Likely Had COVID-19*, Ctrs. for Disease Control (May 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html ............................................... 12

William Cummings, *Ex-Trump campaign chairman Paul Manafort asks to serve sentence from home during coronavirus*, USA TODAY, Apr. 14, 2020, https://www.usatoday.com/story/news/politics/2020/04/14/coronavirus-paul-manafort-seekshome-confinement/2987677001/ ............................................... 3

**Rules**

U.S.S.G. § 1B1.13............................................... *passim*

# INTRODUCTION

EMIL BABADJOV, through undersigned counsel, submits this Supplement in further support of his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by his vulnerability to COVID-19. Mr. Babadjov is currently 35 years old, suffers from obesity, and has a significant history of drug use, which places him at a high risk of suffering severe illness and/or dying from COVID-19. To make matters worse, he is currently incarcerated in deplorable conditions at USP Lompoc, where hundreds of prisoners have tested positive for the virus. If forced to remain in custody for the remaining 28 months of his 70-month sentence, he is at serious risk of suffering serious complications and/or death from COVID-19.

Additionally, the factors under 18 U.S.C. § 3553 weigh in favor of sentencing Mr. Babadjov to time served. Mr. Babadjov's offense was a first time, non-violent drug offense that was committed entirely to support an all-consuming addiction to methamphetamine, heroin, and fentanyl. For that offense, he has served 42 months or 60% of his total sentence, and an even greater percentage considering good time credit. He has been a productive member during his time in custody and has taken steps to rehabilitate himself including completing the Residential Drug Abuse Program ("RDAP") and working as an orderly. While Mr. Babadjov stumbled at times while on pretrial release because of his addiction and incurred a disciplinary infraction while serving his sentence, he has taken many positive strides toward beating his addiction including completing RDAP. Apart from a single infraction, he has otherwise been an exemplary inmate while in custody. Further, Mr. Babadjov is not and has never been a danger to the community. Finally, Mr. Babadjov has a release plan that would allow him to self-isolate and get back on his feet once he is released. Accordingly, this Court should grant Mr. Babadjov's motion for compassionate release as other district courts have done for prisoners whose health has been put at serious risk while incarcerated at USP Lompoc. *See, e.g.*, *United States v. Gorai*, No. 18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020); *see also United States v. Robinson*, No. 18-cr-00597-RS, 2020 WL 1982872, *2 (N.D. Cal. Apr. 27, 2020).

## FACTUAL BACKGROUND

On October 16, 2017, Mr. Babadjov pleaded guilty pursuant to a written plea agreement to a single count of distribution of a controlled substance under 21 U.S.C. § 841(a)(1) and (b)(1)(C) for distributing heroin, fentanyl, and methamphetamine, all to support an addictions to various controlled substances he has suffered since as far back as age 12. (ECF Nos. 33, 34; PSR at ¶¶ 21, 54-55.) The factual basis of the plea agreement provided that from November 2015 to December 2016, Mr. Babadjov distributed approximately 1,141.32 grams of heroin, 66.07 grams of fentanyl, and 510.48 grams of methamphetamine on AlphaBay, a "darkweb" marketplace. (ECF No. 34 at 10.) Following an investigation, Mr. Babadjov's presentence report found a sentencing range of 70 to 87 months imprisonment, followed by a 36 month term of supervised release based on the U.S. Sentencing Guidelines ("Guidelines"). (PSR at 3.) The Probation Office recommended 70 months incarceration followed by 36 months of supervised release, the low end of the Guidelines range, because of Mr. Babadjov's "pro-social familial support, lack of prior criminal convictions, positive education and employment history[,]" because it was "evident he suffers from alcohol and illegal controlled substance abuse issues and is desirous of participating in substance abuse treatment[,]" and because "he is also desirous of attending mental health treatment to address a possible addictive behavior disorder, which is noteworthy[.]" (PSR at 18.) As the probation officer noted, Mr. Babadjov accepted responsibility for his wrongdoing (PSR at ¶¶ 20-21, 32-33), and had no prior criminal history (PSR at ¶ 36-40) apart from a pending charge from 2015 that was also drug-related. (PSR at ¶ 42). Mr. Babadjov, whose life had been "consumed" by addiction, and whose sole "daily motivation was to 'get more drugs[,]'" said that he felt "lucky" that he was caught before he killed himself. (PSR at ¶¶ 21, 58.)

On January 16, 2018, this Court followed the probation office's recommendation, and imposed a 70-month term of imprisonment, followed by a 36-month term of supervised release. (ECF No. 39 at 1-3.) Mr. Babadjov has been incarcerated at USP Lompoc since he was sentenced. To date, Mr. Babadjov has served approximately 42 months of his 70 month sentence, and has an expected release date of February 12, 2022. (Exh. A at 5 [Individualized Re-Entry Plan/Sentencing Monitoring Data Sheet].) During his time in custody, Mr. Babadjov has

generally shown exemplary conduct. He completed the RDAP program and was in aftercare. (*Id.* at 2.) He, however, was expelled from aftercare after he sustained his first and only disciplinary infraction by using Buphenophrine, a medication used to treat opioid disorders, which he was prescribed while on pretrial release. (*Id.* at 6; PSR at ¶ 51.) Mr. Babadjov took responsibility for the infraction by pleading guilty. (Exh. A at 6). Because he would like to continue treatment to the extent he remains in custody, he has appealed his expulsion from aftercare. (Exh. B at ¶ 8 [Gupta Declaration].)

Mr. Babadjov submitted a request for compassionate release to the acting warden of USP Lompoc on May 12, 2020. (ECF No. 40 at 12.) Mr. Babadjov thereafter received a letter from the acting warden dated May 13, 2020 denying his request for compassionate release.[1] (Exh. C [Denial Letter].) More than 30 days have elapsed since Mr. Babadjov submitted his request.

## LEGAL STANDARD

By passing the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended 18 U.S.C. § 3582 and gave defendants the ability to petition courts to reduce their sentences through a request for compassionate release.[2] District courts now have the power to

---

[1] It bears mentioning that while the Bureau of Prisons ("BOP") denied Mr. Babadjov's request for compassionate release or home confinement even though he has served more than 41 months of his 108 month sentence, suffers from serious medical issues, is incarcerated at a facility where nearly 16% of the prisoners have tested positive for COVID-19, the BOP granted Paul Manafort's request to serve the remainder of his sentence for bank and tax fraud in home confinement even though he has only served approximately 24 months of his 73 month sentence, expects to be released on November 3, 2024, and is incarcerated at a facility, Loretto FCI, where there have been zero reported cases of COVID-19. *See* William Cummings, *Ex-Trump campaign chairman Paul Manafort asks to serve sentence from home during coronavirus*, USA TODAY, Apr. 14, 2020, https://www.usatoday.com/story/news/politics/2020/04/14/coronavirus-paul-manafort-seekshome-confinement/2987677001/; Kristine Phillips, *Ex-Trump campaign chairman Paul Manafort released from prison amid coronavirus pandemic*, USA TODAY, May 13, 2020, https://www.usatoday.com/story/news/politics/2020/05/13/coronavirus-paul-manafort-released-home-confinement-amid-covid-19/5181984002/.

[2] Congress first enacted 18 U.S.C. § 3582(c)(1) as part of the Comprehensive Crime Control Act of 1984, which was "intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no longer served legislative objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, *5 (S.D.N.Y. Apr. 6, 2020). Congress delegated to the U.S. Sentencing Commission the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons

1  reduce a defendant's sentence after "considering the factors set forth in § 3553(a) to the extent

2  applicable" if it finds that "extraordinary and compelling reasons warrant such a reduction," and

3  that "such a reduction is consistent with applicable policy statements issued by the Sentencing

4  Commission." § 3582(c)(1)(A). The relevant Sentencing Commission policy statement, though it

5  predates the First Step Act, sets forth several "extraordinary and compelling reasons[,]"

6  including (A) the medical condition of the defendant, (B) the age of the defendant, (C) family

7  circumstances, and (D) a "catchall" provision, meaning an "extraordinary and compelling reason

8  other than, or in combination with, the reasons described in subdivisions (A) through (C)."

9  U.S.S.G., § 1B1.13(1)(A) & cmt. 1. The Commission also requires that the defendant not pose a

10  danger to the community. § 1B1.13(2).

11                                          **ARGUMENT**

12         Notwithstanding his young age, Mr. Babadjov is at higher risk of suffering severe illness

13  and/or death from COVID-19 because he suffers from obesity and because he has a very

14  significant history of past drug use. These vulnerabilities constitute "extraordinary and

15  _____

16  for sentence reduction, including the criteria to be applied and a list of specific examples."). In
    2007, more than two decades after the statute was enacted, the Commission issued a guideline
17  stating that "extraordinary and compelling reasons" include medical conditions, age, family
    circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A)-(D). As originally enacted,
18  the statute left sole discretion for filing compassionate release motions with the Director of the
    BOP, who adopted a program statement governing compassionate release that in many ways
19  narrowed the criteria established by the Commission. *See* BOP Program Statement 5050.49. For
    more than three decades, the BOP rarely filed motions on behalf of inmates who met the
20  eligibility criteria. The Office of the Inspector General for the Department of Justice concluded
    in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting
21  in inmates who may be eligible candidates for release not being considered." Dep't of Justice,
    Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release*
22  *Program* (April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf; *see also*
    Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on*
23  *the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/
    reports/2015/e1505.pdf#page=1 ("Although the BOP has revised its compassionate release
24  policy to expand consideration for early release to aging inmates, which could help mitigate the
    effects of a growing aging inmate population, few aging inmates have been released under it.");
25  U.S.S.G. § 1B1.13, app. n.4 (admonishing BOP for its past failure to pursue relief on behalf of
    eligible inmates).
26         Through the First Step Act, enacted December 21, 2018, Congress resuscitated
27  compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief,
    rather than leaving that power solely in the hands of the BOP.  *See* 18 U.S.C. § 3582(c)(1)(A).
28

compelling reasons" for relief under § 3582(c)(1)(A). Because Mr. Babadjov does not pose a danger to the community, and a balancing of the § 3553(a) factors with the risks weighs in favor of release, this Court should grant Mr. Babadjov's motion for compassionate relief, and sentence him to time served. If this Court deems it appropriate, this Court should amend the conditions of supervision to require him to serve what would have been the remaining portion of his custodial term in home confinement.

**A. Mr. Babadjov Has Satisfied the Exhaustion Requirements Set Forth in 18 U.S.C. § 3582(c)(1)(A).**

As a threshold matter, this Court may consider Mr. Babadjov's motion for compassionate release because he has satisfied the exhaustion requirement of § 3582(c)(1)(A). Mr. Babadjov submitted a request for early release due to COVID-19 to USP Lompoc on May 12, 2020 (*see* ECF No. 40 at 11), and received a denial dated the next day, May 13, 2020. (Exh. A.) Since more than 30 days have passed since Mr. Babadjov submitted his request, this Court may consider Mr. Babadjov's motion as numerous courts have found that 18 U.S.C. § 3582(c)(1)(A) does not require an individual to appeal the BOP's denial before requesting relief from the courts. *See United States v. Burnside*, --- F.Supp.3d ---, 2020 WL 3443944, at *6 (N.D. Iowa, Jun. 18, 2020) (collecting cases).

**B. Mr. Babadjov's Vulnerability to COVID-19 Constitutes an "Extraordinary and Compelling Reason" Warranting Relief Pursuant to 18 U.S.C. § 3582(c)(1)(A).**

"After a defendant has met the threshold exhaustion requirement, a court may grant [a compassionate release] motion if it finds 'extraordinary and compelling reasons warrant' a reduction." *United States v. Kesoyan*, No. 15-cr-0236-JAM, 2020 WL 2039028, at *3 (E.D. Cal., Apr. 28, 2020). While Congress has not defined which circumstances constitute "extraordinary and compelling reasons[,]" it has specified that such reasons should be consistent with the United States Sentencing Commission's policy statement, which provides that the defendant's medical condition and "other reasons" may serve as "extraordinary and compelling reasons" to grant compassionate release. *See* U.S.S.G § 1B1.13(1)(A) & cmt. 1.

1       Under the "medical condition" scenario set forth in that policy statement, a medical

2   condition afflicting a defendant constitutes an "extraordinary and compelling reason" if the

3   defendant is suffering from "a serious physical or medical condition," "a serious functional or

4   cognitive impairment, or" is "experiencing deteriorating physical or mental health because of the

5   aging process," which "substantially diminishes the ability of the defendant to provide self-care

6   within the environment of a correctional facility and from which he or she is not expected to

7   recover." *See* U.S.S.G § 1B1.13(1)(A) & cmt. 1; *United States v. Robinson*, No. 18-cr-00597-RS,

8   2020 WL 1982872, *2 (N.D. Cal. Apr. 27, 2020) (finding that a defendant who suffered from

9   psoriasis for which he took an immunosuppressant drug, and from hypertension was at higher

10   risk of contracting COVID-19 and suffering complications, and thus had shown "extraordinary

11   and compelling reasons" justifying compassionate release); *see United States v. Rodriguez*, --- F.

12   Supp. 3d ---, 2020 WL 1627331, at *7-8 (E.D. Pa. Apr. 1, 2020) (finding that prisoner who

13   suffered from both diabetes and hypertension faced a heighted risk of severe medical

14   consequences and/or death if the prisoner contracted COVID-19 and thus had shown

15   "extraordinary and compelling reasons" justifying compassionate release).

16       Following the passage of the First Step Act, the Sentencing Commission has not updated

17   the policy statement. *See Rodriguez*, 2020 WL 1627331, at *3 ("The commission has not

18   updated its policy statement to account for the changes imposed by the First Step Act, and the

19   policy statement is now clearly outdated"). Numerous courts, however, have held that they have

20   the discretion and authority to act on motions for compassionate release and determine for

21   themselves which "extraordinary and compelling reasons" fall within the scope of the "other

22   reasons" scenario of the policy statement. *Kesoyan*, 2020 WL 2039038, at *3-4 ("In finding that

23   this Court may order release in a case involving an extraordinary and compelling reason other

24   than, or in combination with, the reasons described in subdivisions (A) through (C), this Court

25   follows a growing list of district courts within this circuit and others, that have concluded they

26   also have discretion under Subdivision (D)."); *Rodriguez*, 2020 WL 1627331, at *4 (policy

27   statement provides helpful guidance, but "does not constrain" a court's "independent assessment

28   of whether 'extraordinary and compelling reasons' warrant a sentence reduction[.]"); *United*

*States v. Rodriguez*, 424 F. Supp. 3d 674, 681-82 (N.D. Cal. 2019) ("The only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'"); *United States v. Fox*, No. 14-cr-03, 2019 WL 3046086, at *2-3 (D. Me. July 11, 2019) ("the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive given the statutory change."); *United States v. Almontes*, No. 05-cr-58, 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020) ("nearly all district courts hold that—since the FSA's passage—section 1B1.13 is not binding but is, rather, helpful guidance."); *United States v. Urkevich*, No. 03-cr-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) ("[T]he Commission's failure to amend Guideline § 1B1.13 and related Commentary following the First Step Act does not preclude a court from acting on motions for sentence reductions or using the catch-all provision in Application Note 1(D).").

Here, Mr. Babadjov suffers from obesity and has a long history of past drug use. These conditions combined with the unmitigated spread of COVID-19 at USP Lompoc and its lack of adequate medical care place him at the highest risk of infection, severe illness and/or death, and substantially diminish his ability to care for himself in the correctional facility environment. Even if this Court were to find that he does not fit within the precise contours of "medical condition" scenario, this Court has the discretion and authority to find that he falls within the scope of the "other reasons" scenario of the Sentencing Commission's outdated policy statement.

### 1. Mr. Babadjov Suffers from a Serious Medical Condition as His Obesity and History of Drug Use Pose a High Risk of Serious Illness and/or Death from COVID-19.

It would be a mistake to believe that COVID-19 only severely impacts older people.[3] Younger adults, who are healthy and do not necessarily have any underlying conditions, are

---

[3] CNBC, *WHO says 'more and more' young people are dying from the coronavirus*, https://www.cnbc.com/2020/04/03/who-says-more-and-more-young-people-are-dying-from-the-coronavirus.html (last accessed June 25, 2020).

experiencing extreme illness requiring hospitalization, and some are dying.[4] Indeed, in the United States, adults aged 20 to 44 years old account for 20 percent of hospitalizations and 12 percent of intensive care unit ("ICU") admissions.[5]

The case is even starker for younger adults who do suffer from underlying conditions. Data shows in no uncertain terms that people who suffer from obesity are at the highest risk of suffering severe complications and/or death from COVID-19 regardless of age. The Journal of the American Medical Association published the nation's first large-scale study of patients hospitalized with COVID-19 related complications. Of 5,700 patients hospitalized, 41% were obese.[6] Indeed, studies conducted by New York University's Langone Health on more than 4,000 COVID-19 patients who sought care found that "[o]besity is more important for hospitalization than whether you have high blood pressure or diabetes, though these often go together, and it's more important than coronary disease or cancer or kidney disease, or even pulmonary disease."[7] Obesity also presents a higher risk of death from COVID-19.[8]  Obesity in younger adults is particularly concerning. Another study conducted by NYU Langone Health focusing specifically on patients under the age of 60 found that those with obesity were twice as likely to be hospitalized and were at even higher risk of requiring critical care.[9]

While the Centers for Disease Control prior to June 25, 2020 listed only severe obesity—defined as a body mass index ("BMI") of 40 and over—as a factor for those who are at higher

---

[4] *Id.*; Boston 25 News, *Young, middle-aged people hospitalized with coronavirus at high rates*, April 28, 2020, https://www.boston25news.com/news/health/young-middle-aged-people-hospitalized-with-coronavirus-high-rates/WLAIK65QEJGW3BN2M2NGZZROYQ/ (last accessed June 25, 2020).

[5] https://www.hopkinsguides.com/hopkins/view/Johns_Hopkins_ABX_Guide/540747/all/Coronavirus_COVID_19__SARS_CoV_2_, last accessed June 25, 2020.

[6] Safiya Richardson, MD, MPH, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, Journal of the American Medical Ass'n (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184.

[7] Roni Caryn Rabin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-risk.html (quoting Dr. Leora Horwitz, senior author of the study and director of the Center for Healthcare Innovation and Delivery Science at NYU Langone).

[8] *Id.*

[9] *Id.*

risk for severe illness, the CDC notably revised that guidance to recognize that obesity

generally—defined as a BMI over 30—increases one's risk of severe illness and/or death from

COVID-19.[10] Preceding this revision, the CDC's own study found that general obesity was one

of the most prevalent underlying medical conditions for patients hospitalized with COVID-19,

and indeed was the *most* prevalent condition for those ages 18 to 49 years old.[11]

       Further, individuals with substance use disorders may be at greater risk of infection and

severe illness/death. Specifically, those with a history of smoking or vaping tobacco or marijuana

are vulnerable because those drugs adversely affect an individual's respiratory and pulmonary

function, amplifying complications like acute respiratory distress syndrome (ARDS) brought on

by COVID-19.[12] Smoking or vaping tobacco or marijuana is so significant, the University of

California, San Francisco has added it to its COVID-19 triage protocol.[13] Similarly, the National

Institute on Drug Abuse, a government agency within the National Institutes of Health, has also

recognized that a history of methamphetamine use also puts individuals at risk because

"[m]ethamphetamine constricts the blood vessels, which is one of the properties that contributes

---

[10] *Compare Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html, *with People of Any Age with Underlying Medical Conditions*, Centers for Disease Control & Prevention (rev. June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity.

[11] Shikha Garg, M.D., et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-Net, 14 States, March 1-30, 2020*, Morbidity and Mortality Weekly Report, Centers for Disease Control (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm#suggestedcitation.

[12] Dr. Nora Volkow, *COVID-19: Potential Implications for Individuals with Substance Use Disorders*, National Institute on Drug Abuse (Apr. 6, 2020), https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders; *Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (describing individuals with lung disease and serious heart conditions as those at high-risk for severe illness from COVID-19).

[13] Stanton A. Glantz, Ph.D., *Reduce your risk of serious lung disease caused by corona virus by quitting smoking and vaping*, University of California, San Francisco, Center for Tobacco Control Research & Education (May 13, 2020), https://tobacco.ucsf.edu/reduce-your-risk-serious-lung-disease-caused-corona-virus-quitting-smoking-and-vaping.

1   to pulmonary damage and pulmonary hypertension in people who use it."[14] Methamphetamine

2   use also contributes to local immune dysregulation, and alters the expression of certain enzyme

3   receptors that are key sites for COVID-19 to bind in the lungs and small intestine.[15] The CDC

4   recently revised its guidance to recognize that smoking tobacco increases one's risk.[16] It has yet

5   to offer guidance on other substance use.

6       Here, Mr. Babadjov is 35 years old, and meets the criteria for obesity based on his BMI,

7   which is approximately 31 based on his height (5 feet, 9 inches) and current weight

8   (approximately 205 to 210 lbs).[17] Because of this alone, he is at higher risk of severe illness

9   and/or death from COVID-19. Mr. Babadjov is additionally vulnerable because of his significant

10   history of past substance use, which includes smoking marijuana from the age of 12 once or

11   twice a month until the age of 32, and smoking methamphetamine daily before switching to

12   injecting methamphetamine and heroin daily from the age of 17 to when he was incarcerated.

13   (PSR at ¶¶ 54-59.)

14       Mr. Babadjov is additionally vulnerable for the sole reason that he is male. For unknown

15   reasons, COVID-19 kills far more men than it does women.[18]

16

17       [14] Dr. Nora Volkow, *COVID-19: Potential Implications for Individuals with Substance Use Disorders*, National Institute on Drug Abuse (Apr. 6, 2020),
18   https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders.
19       [15] Carrico, A. W., Horvath, K. J., Grov, C., Moskowitz, J. T., Pahwa, S., Pallikkuth, S., & Hirshfield, S. (2020). *Double Jeopardy: Methamphetamine Use and HIV as Risk Factors for COVID-19*. AIDS and behavior, 1–4. Advance online publication.
20   https://doi.org/10.1007/s10461-020-02854-w.
21       [16] *People of Any Age with Underlying Medical Conditions*, Centers for Disease Control & Prevention (rev. June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
22   conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity.
23       [17] *Calculate Your Body Mass Index*, U.S. Dept. Health & Human Svcs., Nat'l Heart, Lung & Blood Institute, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited June 23, 2020) (stating that "Obesity = BMI of 30 or greater."). Mr. Babadjov's weight in 2017 prior to entering custody was 200 lbs. (PSR at ¶ 2.) His medical records from BOP do not provide his current weight. The last few times that Mr. Babadjov weighed himself were at the beginning of 2020, and he weighed 205 to 210 lbs. (Exh. B at ¶ 7.)
24
25
26
27
28       [18] Chris Mooney, et al., *All across the United States, the coronavirus is killing more men than women, data show*, Washington Post (Apr. 4, 2020),
https://www.washingtonpost.com/health/2020/04/04/coronavirus-men/.

Thus, Mr. Babadjov suffers from "a serious physical or medical condition" within the meaning of the Sentencing Commission's policy statement. *See* U.S.S.G § 1B1.13(1)(A) & cmt. 1. An ever expanding number of courts agree, and have found that those who are young and suffer from obesity in the face of COVID-19 present "extraordinary and compelling reasons" justifying their compassionate release. *See*, *e.g.*, *Burnside*, 2020 WL 3443944 (granting compassionate release to 24 year old suffering from obesity and other medical issues); *United States v. Common*, No. 17-cr-30067, 2020 WL 3412233 (C.D. Ill. June 22, 2020) (granting compassionate release to 39 year old man suffering from obesity, hypertension, and asthma); *United States v. Hunt*, No. 18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (granting compassionate release to 30 year old suffering from obesity and other conditions).

2.      **The Conditions at USP Lompoc Significantly Diminish Mr. Babadjov's Ability to Provide Self-Care.**

USP Lompoc, where Mr. Babadjov is incarcerated, and its nearby partner facility, FCI Lompoc, have earned the ignominious distinction of being the site of the largest COVID-19 outbreak at any BOP facility. As of June 23, 2020, USP Lompoc has 175 inmates and 24 staff members who have tested positive for COVID-19.[19] Two inmates have died.[20] USP Lompoc holds 1,555 total inmates,145 inmates at Camp N, 316 inmates the Camp, and 1,094 inmates at the USP.[21] This means 11% of the total prisoner population, and 16% of the USP population have tested positive. As high as the number already is, the total number of prisoners who have or have had COVID-19 is likely even higher since BOP only reports cases that have been confirmed by a lab test, not those cases where a prisoner is showing symptoms of COVID-19, but where a diagnosis has not been corroborated.[22] Of the number of positive cases, 166 inmates and 22 staff members have supposedly "recovered," even though the CDC guidelines used to

---

[19] *See https://www.bop.gov/coronavirus/* (last visited June 23, 2020).
[20] *Id.*
[21] https://www.bop.gov/locations/institutions/lom/
[22] Walter Pavlo, *Federal Judges Are Relying on Bureau of Prisons COVID-19 Numbers to Make Rulings*, FORBES (May 20, 2020), https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#34d2a14512c7

make that designation are not standards for deeming people "recovered."[23] Instead, they are standards for when individuals may stop self-isolating.[24] As the tragic death of a supposedly "recovered" prisoner at Terminal Island demonstrates, these standards are hardly reliable.[25]

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[26] "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[27] The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities as there are many opportunities for introduction into a facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members.[28] Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.[29] Hand sanitizer, an effective disinfectant recommended

---

[23] *https://www.bop.gov/coronavirus/* (last visited June 4, 2020). Richard Winton, *Inmate labeled as 'recovered' from coronavirus dies at Terminal Island*, Los Angeles Times (May 28, 2020), https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison.

[24] *When You Can be Around Others After You Had or Likely Had COVID-19*, Ctrs. for Disease Control (May 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html.

[25] *Inmate Death at the FCI Terminal Island*, Bureau of Prisons, https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf (last visited June 23, 2020); Richard Winton, *Inmate labeled as 'recovered' from coronavirus dies at Terminal Island*, Los Angeles Times (May 28, 2020), https://www.latimes.com/california/story/2020-05-28/ninth-inmate-dies-coronavirus-terminal-island-prison.

[26] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (2007), https://doi.org/10.1086/521910.

[27] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[28] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/.

[29] Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/ 815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol

content.[30] Additionally, incarcerated people tend to be in poorer health than the general

population.[31] Medical care of prisoners is limited at the best of times.[32] Because of these

dangers, the public health community has insisted on reducing the prison population, both for the

health of inmates and the health of the community.

Similarly, on March 23, 2020, a bipartisan group of 14 senators wrote to Attorney

General William Barr and the Director of the BOP expressing "serious concern for the health and

wellbeing" of those inmates "most vulnerable to infection," and acknowledging that

"[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to

protect themselves, and prisons often create the ideal environment for the transmission of

contagious disease."[33] The senators urged the BOP to use its tools like home confinement and

compassionate release to discharge vulnerable inmates from prison.

As to USP Lompoc specifically, the layout and how it is operated only exacerbates the

spread of COVID-19 and the potential for infection. USP Lompoc is a medium security

institution. Though Mr. Babadjov is a low security risk and presents no danger, he is currently

---

[30] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[31] Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, 2011-12, Bureau Of Justice Statistics, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[32] *See Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, U.S. Dep't of Justice Office of the Inspector General (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

[33] Letter from Senator Charles Grassley et al. (Mar. 23, 2020), *available at* https://www.grassley.senate.gov/sites/default/files/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.

located in USP Lompoc Unit M, where approximately 200 other prisoners are confined two

apiece to cells that have open bars on one side. (Exh. B at ¶ 2.) Each cell has a bunk bed, which

means prisoners in each cell are sleeping within 2-3 feet of each other. (*Id*.) While there is a

toilet per cell, the 200 prisoners in Unit M share 8 showers, which they are only allowed to use

three times a week. (*Id*.) Prisoners have a single set of clothes and laundry is done in M unit once

a week. (*Id*.)

Prisoners are confined to their cells for nearly the entirety of the day, and are not allowed

to leave to isolate themselves, get fresh air, or exercise. (*Id*. at ¶ 3.) Prisoners are only allowed

outside those cells three times a week for approximately an hour to shower and to communicate

with the outside world. (*Id*.) The ventilation in Unit M is poor, which means that each prisoner is

breathing in the air and respiratory droplets of every other prisoner housed in that unit. (*Id*.)

Prisoners are only given unsoiled masks every few weeks. (*Id*.) Other prisoners in Unit M do not

wear their masks. (*Id*.) Orderlies who serve meals do not wear gloves or other PPE while doing

their jobs. (*Id*.) Despite its promises, the BOP has not provided Mr. Babadjov with hand

sanitizer, towels, or cleaning supplies. (*Id*.) Instead, BOP only provides a single bar of lye soap

once a week. (*Id*.) Additionally, Unit M is not being disinfected. (*Id*.)

Prison staff who enter Unit M do so without wearing masks or other PPE. (*Id*. at ¶ 4.)

Even more alarming, staff are not being tested to ensure that they are not bringing the virus into

the facility and into Mr. Babadjov's unit. (*Id*.) This is because BOP has decided to make staff

members pay out of their own pockets for testing. (*Id*.) Since staff members have chosen not to

incur this expense, they may be bringing COVID-19 into the prison and into Mr. Babadjov's unit

even though it is supposed to be a unit housing prisoners who have tested negative for the virus.

(*Id*.) And even as a supposedly "clean" unit, Unit M previously housed prisoners who had

COVID-19 and was not disinfected or cleaned before prisoners who had tested negative were

moved in. (*Id*. at ¶ 5)

The conditions in Unit M are consistent with conditions reported in other cases. The class

action lawsuit filed by the American Civil Liberties Union ("ACLU") against the Warden of

FCC Lompoc, alleges:

> Plaintiff-Petitioner Felix Samuel Garcia…is incarcerated at USP Lompoc…Petitioner G arcia was abruptly moved to a makeshift cell block set up in a warehouse at USP Lompoc. There, he sits in a small cell with one other prisoners, under total lockdown almost twenty-four hours a day. He is not allowed to shower or change into clean clothes, and has been forced to wet his body with water from his sink in a last resort to maintain personal hygiene.

(Exh. D at ¶ 13.[ACLU Class Action Complaint].)

> Things are not much better for the USP Lompoc prisoners who live in cells. Due to the influx of prisoners from the dormitories, tiny single-occupancy cells are now occupied by two prisoners at a time. Due to the facility-wide lockdown, prisoners are unable to leave their cells to take a shower or change into clean clothes.

(*Id*. at ¶ 49.) Additionally, the lawsuit alleges that the BOP has provided one face mask, which Lompoc prisoners have been forced to reuse since the outbreak started. (*Id*. at ¶ 54.) The BOP has failed to provide adequate supplies of soap as there have been shortages, and has altogether failed to provide hand sanitizer for prisoners, making it virtually impossible for prisoners to maintain good hygiene. (*Id.*)

The conditions at USP Lompoc are in direct contravention of CDC guidance recommending that people keep at least six feet distance from others, keep away from those who are sick, wash their hands frequently, and disinfect commonly touched surfaces frequently.[34] It is also in contravention of specific guidance that the CDC has issued for correctional facilities, including implementing social distancing to increase physical space between prisoners regardless of the presence of COVID-19 symptoms, isolating prisoners showing COVID-19 symptoms and quarantining those that have been in contact with that individual, ensuring that there is an sufficient stock of hygiene supplies, cleaning supplies, and PPE, providing a no-cost supply of soap and hand sanitizer to prisoners sufficient to allow frequent handwashing and maintenance of good hand hygiene, implementing intensified cleaning and disinfecting procedures and ensuring adequate supplies to support intensified cleaning and disinfecting practices.[35]

---

[34] *What You Can Do*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html..

[35] *Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control, 7-10 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

1        These conditions make it impossible for Mr. Babadjov to adequately care for and protect

2   himself despite his vulnerable condition. Courts have recognized that "the presence of COVID-

3   19…necessitates a more expansive interpretation of what self-care means" under the "medical

4   condition" scenario of the Sentencing Commission's policy statement to include COVID-

5   vulnerability combined with an inability to implement and practice CDC-recommended

6   procedures to safeguard against transmission. *See*, *e.g.*, *United States v. Esparza*, No. 07-CR-

7   00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020); *Gorai*, 2020 WL 1975372 at *2

8   (finding the same and granting compassionate release to inmate who suffered from asthma

9   incarcerated at USP Lompoc); *United States v. Atkinson*, No. 19-cr-0055, 2020 WL 1904585, at

10  *3 (D. Nev. Apr. 17, 2020) (granting compassionate release to inmate suffering from an

11  unspecified severe illness who was unable to protect himself from contracting COVID because

12  of prison conditions including a lack of cleaning supplies); *United States v. Hird*, Case No. 2:13-

13  cr-39-TJS, Dkt. No. 650 (E.D. Pa. May 19, 2020) (government concession that "the risk of

14  COVID-19" to a vulnerable inmate "presents 'a serious physical or medical condition . . . that

15  substantially diminishes the ability of the defendant to provide self-care within the environment

16  of a correctional facility").

17       In *Esparza*, the defendant seeking compassionate release was an elderly inmate suffering

18  from a number of ailments that put him at increased risk from COVID-19. 2020 WL 1696084, at

19  *2. There, the court noted that:

20      [T]he prison environment prevents [the defendant] from being able to effectively
        self-isolate in the ways the CDC recommends for a person of his age and

21      diminished health. In this moment, the inability for high risk individuals to fully
        self-isolate is an inability to provide self-care. So long as [defendant] remains in

22      custody, his capacity to protect himself from a serious, or even fatal, infection will
        be compromised.

23

24  *Id*. at *3. It added that "[e]ven in the best run prisons, officials might find it difficult if not

25  impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates

26  and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others."

27  *Id*. at *2.

28

1    Here, the conditions at USP Lompoc make it impossible for Mr. Babadjov to provide

2    self-care. Because he lives in a Unit housing 200 other men in small, open-barred cells, each cell

3    sleeping two men 2-3 feet away from each other, Mr. Babadjov simply cannot isolate himself.

4    He does not have any PPE, and does not get unsoiled cloth masks regularly enough to protect

5    himself from others' respiratory droplets or to protect others from his own. He does not get to

6    shower or change his clothes regularly enough to maintain basic hygiene and wash away others'

7    respiratory droplets that have settled on his body or clothes. And he does not get cleaning

8    supplies besides a single bar of lye soap to disinfect the area around his own small living space.

9    Further, in the event that Mr. Babadjov does contract the virus, it is inevitable that he will

10   not receive appropriate medical care. On top of his other conditions, Mr. Babadjov has long

11   suffered from sciatic nerve pain. (PSR at ¶ 50.) Before the outbreak of COVID-19, it took three

12   months before Mr. Babadjov was seen for that pain, and even then, only by a nurse who was

13   supposed to order an x-ray, but never did. (Ex. B at ¶ 7.) Following the outbreak of COVID-19,

14   Mr. Babadjov put in another request to be seen for his pain, but has received no response to date.

15   (*Id*.) Additionally, before he was moved to Unit M, Mr. Babadjov was housed in Unit I where he

16   witnessed his neighboring inmate, who suffers from chronic obstructive pulmonary disorder, put

17   in five requests in a week to be seen because he was experiencing chest pain. (*Id* at ¶ 6.) Despite

18   his alarming chest pain and his COPD, which puts him at the highest risk of severe illness and/or

19   death from COVID-19, this person was not seen by medical staff all time that Mr. Babadjov was

20   in Unit I. (*Id*.) He also witnessed another inmate suffering from a bulging hernia remain unseen

21   and untreated despite repeated requests for medical care. (*Id*.)

22   The inadequacy in care is also evidenced by the circumstances in which other inmates

23   have been treated. 60-year old prisoner Efrem Stutson died from COVID-19 just days after being

24   released from FCI Lompoc.[36] His condition upon release was so bad that Mr. Stutson could

25   barely walk off the bus he took from FCC Lompoc, and within six hours of getting off that bus

26

27

28   [36] Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, Los Angeles Times (Apr. 16, 2020), https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected.

was taken by paramedics to a hospital, where he died a few days later.[37] Further, the ACLU's

class-action lawsuit against the Warden of Lompoc details several instances of prisoners not

receiving adequate medical care after testing positive for COVID. (Exh. D at ¶¶ 10-11, 56-57.)

As just one example, Plaintiff-Petitioner Yonnedil Carror Torres, a 24 year old suffering from

chronic asthma incarcerated at USP Lompoc, started feeling seriously ill and developed COVID-

19 symptoms. (*Id*. at ¶ 10.) Mr. Torres requested medical assistance for five days. (*Id*.) For five

days, however, he was ignored. (*Id*). Only when he went into acute respiratory shock and

collapsed in his cell was he tested for COVID-19, which confirmed he had contracted the virus,

and provided with medical care by being put on a ventilator. (*Id*.) The Santa Barbara

Independent reported that Edgar Udarbe, a 52 year old incarcerated at USP Lompoc,

> [F]ell ill on May 21, according to a letter from a fellow inmate and verified by
> other sources. He developed vertigo and was unable to climb onto his top bunk, so
> inmates cleared a bottom bunk, where he lay semi-comatose for four days during
> which he did not eat or drink and needed help going to the bathroom. While
> fellow inmates summoned correctional officers to Udarbe's bedside multiple
> times, the letter claims, none offered to assist other than to note his condition in
> their log book. It was only when Udarbe couldn't stand for a morning count after
> the long holiday weekend that officers finally allowed an inmate to take him by
> wheelchair to the prison's medical bay, after which he was transferred to the ICU
> at Lompoc Valley Medical Center.[38]

Medical care outside of the prison is similarly insufficient. The Washington Post

has reported that FCC Lompoc's eye-watering number of COVID-19 cases are "a burden

on the compact town of 40,000, where locals and the prison system share the same fire

department and hospital."[39] While BOP is not reporting on the numbers of prisoners

being hospitalized from the virus, the strain on local healthcare facilities is evidenced by

BOP's plan to convert an old factory on the prison grounds into a hospital.[40]

---

[37] *Id*.

[38] Tyler Hayden, *More Suffering and Death at Lompoc Prison Racked with COVID-19*, Santa Barbara Independent (May 29, 2020), https://www.independent.com/2020/05/29/more-suffering-and-death-at-lompoc-prison-wracked-with-covid-19/.

[39] Kimberly Kindy, et al., *These towns love their federal prison. But covid-19 is straining the relationship*. Washington Post (May 9, 2020), https://www.washingtonpost.com/national/these-towns-love-their-federal-prison-but-covid-19-is-straining-the-relationship/2020/05/08/68e93702-9084-11ea-9e23-6914ee410a5f_story.html.

[40] Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, Los Angeles Times (Apr. 16, 2020),

1    Further, Mr. Babadjov's conditions are conditions from which he "is not expected to

2  recover[,]" especially while in prison. Mr. Babadjov's obesity is a chronic condition because it is

3  extraordinarily difficult for him to lose weight while at USP Lompoc when he is not being

4  provided an adequate diet that would enable him to lose weight, and when he is confined to a

5  tiny cell 24 hours a day in which he cannot move. It should not come as a surprise that his weight

6  has increased from 200 lbs. at the time of his PSR to 205-210 lbs now. (*See* PSR at 2; Exh. B at

7  ¶ 7.) Additionally, his history of past drug use likely resulting in significant pulmonary and

8  cardiovascular damage is also a chronic condition. Thus, Mr. Babadjov's underlying medical

9  conditions constitute a "serious physical or medical condition" from which he "is not expected to

10  recover."

11    Accordingly, Mr. Babadjov falls within the scope of the "medical condition" scenario of

12  the Sentencing Commission's policy statement. Even if this court were to find that he does not fit

13  within the precise contours of that scenario, this Court has the discretion and authority to find

14  that he falls within the scope of the "other reasons" scenario of the policy statement. *See*

15  *Kesoyan*, 2020 WL 2039038, at *3-4. As such, Mr. Babadjov has demonstrated that his medical

16  issues present "extraordinary and compelling reasons" warranting compassionate release.

17  **C.  The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Babadjov's**

18  **Prison Sentence to Time Served.**

19    When "extraordinary and compelling reasons" have been established, courts must

20  consider the relevant sentencing factors in 18 U.S.C. § 3553(a) to determine whether a

21  sentencing reduction or modification is warranted. *See* 18 U.S.C. § 3582, this Court must also

22  consider post-offense developments, including the "most up-to-date picture" of the defendant's

23  history and characteristics, under § 3553(a). The circumstances of this case demonstrate that the

24  time that Mr. Babadjov has served is sufficient to satisfy the purposes of sentencing.

25    As a threshold matter, the overriding factor under § 3553(a) that was not present at the

26  time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the

27

28
―――――――――――――
https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected

circumstances of the present offense qualified Mr. Babadjov for the serious sentence originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes suffering serious complications and/or dying from a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions).

As to the nature and circumstances of the offense and Mr. Babadjov's history and characteristics, the instant offense was a first-time, non-violent crime. (PSR at 1-2.) As noted in his presentence report, prior to the instant offense, he had no prior criminal history and one prior arrest for an alleged offense that appears to have been the result of Mr. Babadjov's addiction. (PSR ¶¶ 38-44.) While Mr. Babadjov's offense conduct was certainly serious, it was a victimless offense committed entirely to fuel a severe addiction to methamphetamine, fentanyl, and heroin that was spiraling out of control. Apart from his addiction, Mr. Babadjov was a productive member of society, earning a college degree from University of California, Santa Barbara, completing a program at University of California, Los Angeles, working and even starting his own business. (PSR at ¶¶ 60-64.) His addiction, unfortunately, got the better of him and on several occasions almost cost him his life. Yet, as Mr. Babadjov recognized, this offense was a blessing in disguise because it saved his life and forced him to get treatment, which he has now completed through the RDAP program. (PSR at ¶¶ 54-59.)

Continued incarceration is also not necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence to criminal conduct, or protect the community from the defendant. Mr. Babadjov has already served 42 months or 60% of the custodial term of his sentence, which reflects the seriousness of the offense. Factoring in good-time credit, Mr. Babadjov has served an even greater percentage. This substantial period of incarceration has instilled in Mr. Babadjov a respect for the law. The drug treatment he has received while incarcerated has rehabilitated him and serves as a deterrent from any future

criminal conduct insofar as the original impetus for the crime has been removed. While Mr. Babadjov recognizes he has addiction issues, he can deal with those issues through continued treatment and counseling while also protecting himself from COVID-19. Further, Mr. Babadjov has demonstrated generally exemplary conduct while in custody and has been a productive member of the Lompoc community working as an orderly. While he had a set-back after being found with Buphenophrine, this one infraction should not detract from his otherwise exemplary record for three and a half years in custody.  This along with the fact that this offense was Mr. Babadjov's first, demonstrates that he does not pose a danger to society. Thus, continuing to incarcerate Mr. Babadjov during a deadly viral outbreak, without providing him with the tools necessary to protect his health, puts his life at serious risk and would cause "the actual severity of the sentence…[to] exceed what the Court anticipated at the time of sentencing." *United States v. Mel*, No. 18-cr-0571-TDC, 2020 WL 2041674, at *3 (D. Md., Apr. 28, 2020). Continued incarceration could well convert his 70-month sentence into a life sentence, which was certainly not what this Court intended.

Finally, Mr. Babadjov has a release plan that would allow him to shelter in place safely, protecting himself and others from the spread of COVID-19, while also supporting himself, and getting adequate care for his medical needs. Mr. Babadjov proposes living with his parents and 90 year-old grandmother at the family home in Tujunga, California. There, he would have his own bedroom, and would be able to isolate himself upon release. Mr. Babadjov's probation officer, Alan Barahona, did a virtual walk-through of the home in March 2020 and approved it as an appropriate residence for when Mr. Babadjov is released. Mr. Babadjov's parents and grandmother will provide pro-social support and will hold him accountable, ensuring that he does not relapse by continuing with treatment and counseling. Mr. Babadjov acknowledged in his PSR that he stopped seeing his family while he was suffering from his drug addiction because he did not want them to see his track marks. By living with his family, he will remain accountable. Mr. Babadjov's brother, who lives nearby in Marina Del Rey, California, will also provide pro-social support.

1       Mr. Babadjov plans to continue his drug treatment by attending Narcotic Anonymous

2    meetings near his home. He will also attend an outpatient treatment program through Klean

3    Treatment Centers near Tujunga, California. Mr. Babadjov will have access to his parents'

4    vehicle and will be able to transport himself to these meetings.

5       Mr. Babadjov anticipates that he will be financially self-sufficient soon after leaving

6    custody insofar as he will work with his uncle at his uncle's construction company while he

7    continues to look for a permanent job. In the meantime, Mr. Babadjov's parents have offered to

8    support him financially while he gets back on his feet. Mr. Babadjov will "earn his keep" by

9    assisting in caring for his 90 year-old grandmother who is confined to a wheelchair. Mr.

10   Babadjov's parents otherwise have to pay for her care. Mr. Babadjov's parents will also help Mr.

11   Babadjov purchase healthcare insurance. This will cover his medical needs.

12       Placing Mr. Babadjov at the release address would drastically improve his ability to treat

13   his underlying medical conditions and stay clean, while also reducing his risk of contracting

14   COVID-19 and suffering a life-threatening illness and/or death compared to remaining in USP

15   Lompoc. A modification of Mr. Babadjov's sentence would not diminish the seriousness of the

16   offense, nor would it place the public in any danger. The extraordinary and compelling

17   circumstances presented by the uncontrolled spread of COVID-19—compounded by the

18   heightened risks faced by Mr. Babadjov whose ability to engage in basic self-protective

19   measures is restricted—warrant relief. Thus, Mr. Babadjov's incarceration for 42 months is

20   "sufficient, but not greater than necessary" to satisfy the goals of sentencing under § 3553(a).

21   Accordingly, this Court should grant Mr. Babadjov's request for compassionate release and

22   reduce his sentence to time served. Alternatively, if this Court deems it appropriate, this Court

23   should amend the conditions of as supervision to require him to serve what would have been the

24   remaining portion of his custodial term in home confinement.

25

26

27

28

**CONCLUSION**

For the foregoing reasons and the reasons set forth in Mr. Babadjov's original motion, Mr. Babadjov asks this Court to grant his motion for compassionate release pursuant to 18 U.S.C. § 3582 and reduce his sentence to time served, or alternatively, amend the conditions of supervision to require him to serve what would have been the remaining portion of his custodial term in home confinement.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Dated: June 26, 2020                            */s/* Jaya C. Gupta
                                                JAYA C. GUPTA
                                                Assistant Federal Defender

                                                Attorneys for Defendant
                                                EMIL VLADIMIROV BABADJOV