1  McGREGOR W. SCOTT
   United States Attorney
2  GRANT B. RABENN
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone:  (916) 554-2700
   Facsimile:  (916) 554-2900
5
   Attorneys for Plaintiff
6  United States of America

7                    IN THE UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,              CASE NO.  1:16-CR-00204-NONE-SKO

11                       Plaintiff,       UNITED STATES' OPPOSITION TO
                                          DEFENDANT'S MOTION TO REDUCE
12           v.                           SENTENCE PURSUANT TO 18 U.S.C.
                                          § 3582(c)(1)(A)
13 EMIL VLADIMIROV BABADJOV,

14                       Defendant.

15

16

17

18

19

20      **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE
21            PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      **INTRODUCTION**.................................................................................................1

II.    **FACTUAL BACKGROUND**...............................................................................**2**

      A.    Babadjov's Crimes of Conviction..........................................................2

      B.    Procedural History ...............................................................................4

      C.    Incarceration and Projected Release Date............................................4

      D.    Babdjov's Current Motion for Compassionate Release........................4

      E.    Administrative Remedies ......................................................................5

III.   **THE BUREAU OF PRISONS' AND CONGRESS'S RESPONSE TO COVID-19** ...............**5**

           1.    COVID-19-specific safety precautions .................................5

           2.    Administrative options available to inmates .........................7

           3.    Current Conditions at Babadjov's Facility .............................9

IV.   **LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE** .............................................**9**

      A.    Compassionate Release Under the FSA .................................................9

V.    **ARGUMENT**...................................................................................................**11**

      A.    Babadjov Fails to Demonstrate an "Extraordinary and Compelling" Reason to Allow Release in His Case...........................................................11

           1.    Babadjov's health condition does not satisfy U.S.S.G. § 1B1.13........................12

           2.    Babadjov's continuing danger makes him ineligible for compassionate release. ..................................................13

           3.    Disciplinary Action ...............................................................15

           4.    Even If Babadjov Were Otherwise Eligible, the 18 U.S.C. § 3553(a) Factors Do Not Support a Shorter Sentence. .........................15

      B.    18 U.S.C. § 3621(b) Gives the Bureau of Prisons Exclusive Authority to Designate the Place of the Prisoner's Imprisonment. ........................16

VI.   **QUARANTINE REQUESTED**.............................................................................**16**

VII.  **CONCLUSION** ..............................................................................................**17**

**TABLE OF AUTHORITIES**

CASES

*Burg v. Nicklin,*
    No. EP-19-CV-24-FM, 2019 WL 369153 (W.D. Tex. Jan. 29, 2019) ................................. 16

*Dillon v. United States,*
    560 U.S. 817 (2010)................................................................................... 9, 10, 11, 12

*Jones v. Woods,*
    2:19CV61, 2019 WL 2754731 (M.D. Ala. June 4, 2019) ............................................. 16

*Marshall v. English,*
    19-3113-JWL, 2019 WL 3252742 (D. Kan. July 19, 2019) .......................................... 16

*Reeb v. Thomas,*
    636 F.3d 1224 (9th Cir. 2011) .................................................................................... 7

*Shaw v. Bank of America Corp.,*
    946 F.3d 533 (9th Cir. 2019) .................................................................................... 10

*United States v. Applewhite,*
    No. 08-CR-60037, 2020 WL 137452 (D. Or. Jan. 13, 2020) ................................. 13, 14

*United States v. Ayon-Nunez,*
    No. 16-CR-130-DAD 2020 WL 704785 (E.D. Cal. Feb. 12, 2020)................................ 15

*United States v. Butler,*
    970 F.2d 1017 (2d Cir. 1992)..................................................................................... 11

*United States v. Chambliss,*
    948 F.3d 691 (5th Cir. 2020) ..................................................................................... 11

*United States v. Curry,*
    No. 6:06-082-DCR, 2019 WL 508067 (E.D. Ky. Feb. 8, 2019)..................................... 16

*United States v. Ebbers,*
    --- F. Supp. 3d. ---, 2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)............................... 11, 12

*United States v. Eberhart,*
    2020 WL 1450745 ................................................................................................... 12

*United States v. Gileno,*
    2020 WL 1307108 ................................................................................................... 15

*United States v. Gotti,*
    No. 02-CR-743, 2020 WL 497987 (S.D.N.Y. 2020)..................................................... 13

*United States v. Grass,*
    561 F. Supp. 2d 535 (E.D. Pa. 2008) ........................................................................... 7

*United States v. Greenhut,*
    No. 18-CR-48-CAS, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020) ................................. 11

*United States v. Hamilton,*
   715 F.3d 328 (11th Cir. 2013) ........................................................................ 11

*United States v. Hir,*
   517 F.3d 1081 (9th Cir. 2008) ........................................................................ 14

*United States v. Mangarella,*
   2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ................................................ 11

*United States v. Nasirun,*
   No. 8:99-CR-367, 2020 WL 686030 (M.D. Fla. Feb. 11, 2020) ..................... 12

*United States v. Perez-Asencio,*
   No. 18CR3611-H, 2019 WL 626175 (S.D. Cal. Feb. 14, 2019) ...................... 16

*United States v.Raia,*
   2020 WL 1647922 ......................................................................................... 12

*United States v. Urso,*
   No. 03-CR-1382, 2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019) ..................... 13

*United States v. Wages,*
   271 F. App'x 726 (10th Cir. 2008) ................................................................ 11

*United States v. Weidenhamer,*
   No. CR016-01072-001-PHX-ROS, 2019 WL 6050264 (D. Az. Nov. 8, 2019) ........... 10

*United States v. Willingham,*
   No. CR113-010, 2019 WL 6733028 (S.D. Ga. Dec. 10 .................................. 12

*United States v. Willis,*
   382 F. Supp. 3d 1185 (D.N.M. 2019) ............................................................ 11

**STATUTES**

18 U.S.C. § 3142(g) ........................................................................................... 15

18 U.S.C. § 3553(a) ........................................................................................... 15

18 U.S.C. § 3582(c) ............................................................................................. 9

18 U.S.C. § 3582(c)(1) ................................................................................... 5, 10

18 U.S.C. § 3582(c)(1)(A) ......................................................................... passim

18 U.S.C. § 3582(c)(2) ......................................................................................... 7

18 U.S.C. § 3621(b) ....................................................................................... 7, 16

18 U.S.C. § 3622 ................................................................................................. 8

18 U.S.C. § 3624(c)(2) ......................................................................................... 7

18 U.S.C. §§ 3582 ............................................................................................... 9

21 U.S.C. § 841(a)(1) ............................................................................................. 4

28 U.S.C. § 994(t) .......................................................................................... 10, 14

Pub. L. No. 116-136 ............................................................................................ 7

U.S.C. § 841(b)(1)(c) ........................................................................................... 4

**RULES**

U.S.S.G. § 1B1.13 ...................................................................................... passim

U.S.S.G. § 1B1.13(2) ........................................................................................ 13

1  McGREGOR W. SCOTT
   United States Attorney
2  GRANT B. RABENN
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5
   Attorneys for Plaintiff
6  United States of America

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,              CASE NO.  1:16-CR-00204-NONE-SKO

11                        Plaintiff,        UNITED STATES' OPPOSITION TO
                                            DEFENDANT'S MOTION REDUCE
12          v.                              SENTENCE PURSUANT TO 18 U.S.C.
                                            § 3582(c)(1)(A)
13  EMIL VLADIMIROV BABADJOV,

14                        Defendant.

15

16

17                      I.       **INTRODUCTION**

18          Defendant Emil Babadjov moves for a reduction in sentence citing general concerns about the

19  COVID-19 outbreak in his place of incarceration.  Docket Nos. 40, 43.  To the extent that the Court

20  entertains Babadjov's motion for a time-served sentence, he is not eligible for relief because he does not

21  meet the requirements for compassionate release.  Moreover, Babadjov's motion fails to carry his

22  burden of demonstrating extraordinary or compelling reasons to justify the relief he seeks.  For these

23  reasons, his motion should be denied.

24

25

26

27

28

## II.  FACTUAL BACKGROUND

### A.  Babadjov's Crimes of Conviction

In September of 2016, the Fresno branch of the Drug Enforcement Administration (DEA) initiated an investigation into two heroin vendors, "BLIME-SUB" and "BTHOVERDOSE" operating in the dark marketplace, Alpha Bay (Alpha Bay was an e-commerce website operated as a TOR hidden service, which allows users to browse anonymously to purchase a variety of illegal goods, including controlled substances). Through the course of the investigation, DEA investigators discovered that BTH-OVERDOSE and BLIMESUB were operated by Emil Vladimirov Babadjov. A social media search for BLIME-SUB indicated it was previously operated by another vendor account on Alpha Bay called BTH-OVERDOSE. Investigators conducted a Pretty Good Privacy (PGP) Key server[1] search for the PGP key provided by BTHOVERDOSE, which revealed it was registered to Babadjov@gmail.com. A Facebook search of this email address led investigators to a Facebook account belonging to an individual identified as "Lime Vojabab"—the reverse order of these letters spells out "Emil Babadjov." A Facebook search returned a public post made by Babadjov on September 19, 2015, advising that people could email him at the above referenced email address.  PSR ¶¶ 7-8.

On October 20, 2016, investigators logged into an undercover Alpha Bay account and purchased approximately three grams of heroin from BLIME-SUB for approximately $480 worth of Bitcoin (Bitcoin is a type of digital currency; Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity). Investigators included a message requesting BLME-SUB to send the package to a predetermined undercover (UC) address and to a UC name. On October 25, 2016, investigators received notice from a United States Postal Service (USPS) inspector that a parcel had arrived to the UC address and it was addressed to the UC name provided to BLIME-SUB. Investigators retrieved the package, and observed that the return address was 2085 Van Ness Avenue, San Francisco, California 94109.  Inside the parcel, investigators located a black Mylar envelope with several small, clear Ziploc bags containing a white powder.

---

[1] PGP is an encryption program that provides cryptographic privacy and authentication for data communication.  PGP is used for signing, encrypting and decrypting texts, e-mails, files, directories, and whole disk partitions.

OPPOSITION TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE

Investigators conducted a field test of the substance and it tested presumptively positive for the presence of heroin. Investigators sent all the contents to the laboratory for fingerprint and drug analysis.  On November 10, 2016, investigators received laboratory results from the UC purchase. The white substance was identified to be heroin and fentanyl; however, results indicated that most of the powder was actually fentanyl.  PSR ¶¶ 9-11.

A USPS inspector was able to conduct a comparative analysis on the parcel to identify who purchased the postage from the UC purchase, via the Postage Validation Imprinter (PVI) label. The USPS inspector was able to identify the postage was purchased on September 18, 2016, from a Self Service Kiosk (SSK), located at the Macy's USPS Office, 170 O'Farrell Street, San Francisco, California 94102. Because the SSK transactions were non-face-to-face transactions, photos were taken during each transaction that was conducted. The USPS inspector retrieved the photo of the suspect who purchased the postage; the suspect was positively identified as Babadjov.  PSR ¶ 12.

On November 14 and 15, 2016, investigators received information from the Bitcoin exchange company, Coinbase. According to Coinbase, the email address of Babadjob@gmail.com was used on November 13, 2015, to establish a Coinbase account for Babadjov. A subsequent search through Coinbase under Babadjov indicated that on March 15, 2016, Babadjov attempted to establish a Coinbase account using the email address of Blimesub@gmail.com.  On November 16, 2016, investigators received notification that the latent fingerprints located on the exterior of the UC parcel were positively identified as belonging to Babadjov. On December 14, 2016, investigators established surveillance at Babadjov's residence, located at 888 O'Farrell Street, Apartment W810, San Francisco, California. Shortly thereafter, investigators observed a taxi drive into the apartment complex and observed Babadjov exit the taxi and walk towards the apartment entrance. Investigators approached Babadjov and said, "Emil," at which time Babadjov answered, "Yeah?" He was subsequently arrested. Babadjov advised investigators his girlfriend, Lindsey Larsen (Larsen), was inside the apartment and that there was fentanyl stored in a plastic container in the apartment. Investigators retrieved Babadjov's keys from his person and Babadjov called for Larsen to come out of the apartment. Due to the possibility of fentanyl being in the apartment, investigators waited outside for the San Francisco Fire Department Clan Lab Team to make entry.  PSR ¶¶ 13-15.

OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Evidence suggests Babadjov was directly involved in the transactions from November 2015 through December 2016, where he distributed 1,141.32 grams of heroin, 66.07 grams of fentanyl, and 510.48 grams of methamphetamine under the monikers BTHOVERDOSE and BLIME-SUB.  PSR ¶¶ 16-17.

### B.   Procedural History

On December 15, 2016, a federal grand jury returned a single-count Indictment against Babadjov charging distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) & 21 U.S.C. § 841(b)(1)(c) (count one).   Docket No. 7.

On October 16, 2017 by way of a written plea agreement, Babadjov pleaded to the single-count as charged in the Indictment.  Docket Nos. 33, 34.

On January 16, 2018, the Honorable Lawrence J. O'Neill, sentenced Babadjov to 70-months imprisonment, followed by a 36-month term of supervised release, and $100 special assessment.  Docket Nos. 38, 39.

### C.   Incarceration and Projected Release Date

Babadjov is currently serving his 70-month sentence in USP Lompoc. His projected release date is February 12, 2022, based upon application of his good conduct time (GCT).  Thus, defendant has served 40-months, or 57.5%, of his 70-month sentence. Exhibit 1 (BOP Public Information Inmate Data).

### D.   Babdjov's Current Motion for Compassionate Release

Babadjov is currently 35 years old and claims he suffers from a serious health condition.[2] Docket No. 40 at 6.   Appointed counsel for the defendant filed a supplemental brief in support of Babadjov's motion, claiming that he suffers from obesity and significant pulmonary and cardiovascular damage from past drug use.  Docket No. 43 at 26.

The PSR noted that according to the defendant, when he was approximately 12 years old, he underwent an appendectomy. Moreover, he reported in July of 2016, he injured his sciatic nerve while skateboarding and suffers from sporadic pain. According to the PTS report, the defendant suffered from

---

[2] Babadjov's *pro se* motion does not specify any specific health condition.  Docket No. 40 at 6.

OPPOSITION TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE

1  cellulitis and was taking antibiotics as needed.  PSR ¶ 50.

2       Babadjov claims that he is categorized as high-risk for serious complications form COVID-19,

3  because of his health conditions.  Docket Nos. 40 at 6, 43 at 17.  BOP medical records indicate that

4  Babajov has opioid use disorder, stimulant related disorders, and pain (unspecified). Exhibit 2 at 5.

5  (BOP Medical Records Filed Under Seal).  BOP medical records also note that during mass testing

6  Babadjov tested negative for COVID-19 *Id.* at 7.  Babadjov requests a reduction in sentence to time

7  served.

8       **E.**      **Administrative Remedies**

9       Pursuant to 18 U.S.C. § 3582(c)(1), an inmate may file a motion for sentence reduction after

10  completing the BOP exhaustion requirements **or** after waiting 30 days from receipt of a request by the

11  Warden, whichever is earlier.

12       On May 12, 2020, Babadjov submitted a request for compassionate release/reduction in sentence

13  to the Warden. Docket No. 40 at 11. On May 13, 2020, the Warden denied Babdjov's request.  Docket

14  No. 43 Def. Supp. Exhibit A.  More than 30 days have elapsed since receipt of Babadjov's request,

15  satisfying the statutory requirement in 18 U.S.C. § 3582(c)(1).

16    **III.**      **THE BUREAU OF PRISONS' AND CONGRESS'S RESPONSE TO COVID-19**

17       1.     COVID-19-specific safety precautions

18       BOP has taken aggressive steps to protect inmates' and employees' health and to keep COVID-

19  19 outside of its facilities.  Staff are thoroughly screening inmates prior to transfer and upon arrival.

20  Inmates are further being quarantined, isolated, and/or tested based on these best practice measures.

21  Starting in January 2020, the BOP implemented its Pandemic Influenza contingency plan, modified as

22  an Action Plan for COVID-19.  Starting on March 13, 2020, social visits, tours, volunteer visits and

23  inmate facility transfers were suspended, and inmates and staff members underwent health screening.

24  Federal Bureau of Prisons COVID-19 Action Plan, available at: *Federal Bureau of Prisons COVID-19*

25  *Action Plan.*

26       The BOP continues to revise and update its action plan in response to the fluid nature of the

27  COVID-19 pandemic.  Starting on April 1, 2020, the BOP moved to Action Plan Phase V, to further

28  mitigate the exposure and spread of COVID-19.  BOP, COVID-19 Action Plan: Phase Five, available at:

1    *BOP - COVID-19 Action Plan: Phase Five*.  Phase V includes: For a 14-day period, inmates in every

2    institution will be secured in their assigned cells/quarters to decrease the spread of the virus.  Starting on

3    April 13, 2020, the BOP moved to Action Plan Phase VI, to further mitigate the exposure and spread of

4    COVID-19.  *See* BOP, COVID-19 Action Plan, Phase Six, available at:

5    *https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf*.  Phase VI

6    includes: Extension of Phase V until May 18, 2020.  All staff and inmates have been issued and strongly

7    encouraged to wear facemasks in public areas when social distancing cannot be achieved.  *Id*.  On May

8    18, Phase 7 was implemented which is an extension of Phase 6 along with minimizing all movement to

9    stop the spread of the virus.   Modified operation will continue, for all institutions, until at least June 30,

10   2020, available at *BOP: COVID-19 Action Plan: Phase Seven*.  On June 30, 2020, Phase 8 was

11   implemented which is an extension of Phase 7. Modified operations will continue, for all institutions,

12   until at least July 31, 2020.

13           Meanwhile, the BOP has continued working with the CDC, confirming that its approach aligns

14   with current CDC guidance for COVID management in correctional facilities.  Federal Bureau of

15   Prisons, Correcting Myths About BOP and COVID-19, at 1, available at

16   *https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf*

17   ("Correcting Myths").  Currently, BOP medical staff are "conducting rounds and checking inmate

18   temperatures at least once a day"--twice a day where inmates are quarantined or in isolation.  *Id.*  All

19   BOP staff and inmates have been issued cloth masks to wear on a daily basis--with staff required to wear

20   masks, gloves, and potentially gowns when dealing with isolated and quarantined inmates.  *Id.* at 1, 3.

21   "Cleaning supplies have been provided to inmates," and the BOP has provided training on CDC best

22   practices regarding disease transmission and prevention (including sanitation).  *Id.* at 2.  Common areas

23   are sanitized multiple times a day.  *Id.* at 3.

24           The gravity and severity of these measures reflect BOP's commitment to fighting COVID-19

25   and protecting inmates.  However, BOP of course has not been immune from the pandemic.  Across the

26   country, 1,998 BOP inmates in BOP custody---out of a total of approximately 150,000---have been

27   diagnosed with COVID-19. BOP, COVID-19 Coronavirus (updated daily at 3pm), available at

28   *https://www.bop.gov/coronavirus/index.jsp* (last visited July 6, 2020).  All are (or were) isolated from

OPPOSITION TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE

fellow inmates and receiving medical treatment.  Correcting Myths, supra, at 2.  "Inmates whose conditions cannot be managed within the institution are sent to the local hospital[.]"  *Id.*

Of course, "as warned by the Surgeon General of the United States, [the BOP] expect[s] to have more cases as the virus continues to spread in the general community," but they "will continue to diligently support all persons system-wide while doing everything [they] can to do [their] part in mitigating the spread of the virus."  Statement from BOP Director, supra.

2.      Administrative options available to inmates

Inmates with COVID-19-based concerns also have a variety of administrative options they can pursue through the BOP itself.  Although not reviewable by courts, these options include far more flexible remedies than permanent reduction of a sentence under 18 U.S.C. § 3582(c)(2)--remedies better suited to a temporary (if dire) pandemic.  *See generally* 18 U.S.C. § 3621(b) (precluding judicial review of BOP placement decisions); *Reeb v. Thomas*, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (courts lack jurisdiction to review BOP's placement decisions under 18 U.S.C. §§ 3622–24); *United States v. Grass*, 561 F. Supp. 2d 535, 537 (E.D. Pa. 2008) (same).

First, the BOP can transfer vulnerable inmates to home confinement.  The CARES Act, which Congress passed to address the COVID-19 crisis, vastly increased BOP's statutory home-confinement authority.  *See* Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27, 2020) (suspending eligibility limitations imposed by 18 U.S.C. § 3624(c)(2)).

In his April 3, 2020, memorandum authorizing the BOP to exercise its expanded CARES Act authority, the Attorney General emphasized that "time is of the essence," and he directed the BOP to focus on facilities that have significant numbers of COVID-19 cases within their inmate population.  *See* Attorney General, Memorandum for Director of Bureau of Prisons Re: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), available at *https://www.justice.gov/file/1266661/download*.  Thus, the BOP is "urgently reviewing all inmates" to determine their eligibility, increasing resources to "review and make appropriate decisions as soon as possible."  Federal Bureau of Prisons, Home Confinement (Apr. 5, 2020) ("BOP, Home Confinement"), available at *https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp*.  Inmates

OPPOSITION TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE

"do not need to apply to be considered[.]"  *Id.*  "The Department has also increased resources to review and make appropriate determinations as soon as possible."  Correcting Myths, *supra*, at 3.

BOP's release of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking.  BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others--including to the individuals necessary to make home confinement successful.  To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement.

Since the release of the Attorney General's March 26, 2020 memorandum instructing BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 4,600 inmates on home confinement.  BOP, COVID-19 Coronavirus (updated regularly), available at *https://www.bop.gov/coronavirus/index.jsp* (last visited July 6, 2020).  Indeed, the Attorney General's memorandum instructed the BOP to exercise pre-CARES-Act authority as broadly as possible to protect "the people in [their] custody," taking into consideration prisoners' age, vulnerability to COVID-19, and other factors.  *See* Attorney General, Memorandum for Director of Bureau of Prisons Re: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020), available at *https://www.justice.gov/file/1262731/download*.  As noted above, the BOP now has additional authority under the CARES Act to place prisoners on home confinement.

Second, the BOP has authority to grant an inmate a temporary furlough from custody, under 18 U.S.C. § 3622, for "obtaining medical treatment not otherwise available," "visiting a relative who is dying," or "any other significant activity consistent with the public interest."  *See* BOP Program Statement No. 5280.09, Inmate Furloughs (January 20, 2011), available at *https://www.bop.gov/policy/progstat/5280_009.pdf*.  Certain COVID-19-related conditions would potentially satisfy the BOP's requirements for such a furlough.  *Id.*

Finally, under 18 U.S.C. § 3582(c)(1)(A), the BOP has initial authority to assess inmates'

1   applications for compassionate release.  Only the original sentencing judge may ultimately authorize a

2   reduction in an inmate's sentence.  However, the BOP, which has decades of experience diligently

3   assessing such applications, has detailed regulations setting forth relevant procedures and

4   considerations.  *See* BOP Program Statement No. 5050.50, Compassionate Release/Reduction in

5   Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019),

6   available at *https://www.bop.gov/policy/progstat/5050_050_EN.pdf*.

7                    3.      Current Conditions at Babadjov's Facility

8          Currently, there are 8 inmates and zero staff diagnosed with COVID-19 in Babadjov's facility,

9   USP Lompoc.  There have been 2 inmate deaths while 162 inmates and 24 staff have recovered at this

10  institution.   In addition—despite more than 2,910,000 confirmed COVID-19 cases in the United

11  States—1,998 federal inmates and 177 staff have confirmed positive test results for COVID-19

12  nationwide.  Currently, 5,359 inmates and 584 staff have recovered.  All are (or were) isolated from

13  fellow inmates and receiving medical treatment.  *See* Federal Bureau of Prisons, COVID-19

14  Coronavirus (updated daily at 3 p.m.), available at *https://www.bop.gov/coronavirus/* (last visited July 6,

15  2020).

16         The Health Services Administrator for FCC Lompoc, including both USP Lompoc and FCI

17  Lompoc, has recently provided a sworn declaration explaining the isolation, monitoring, and treatment

18  practices at Lompoc.  *See* ECF No. 340-1, *United States v. Eddings*, 2:09-cr-00074-JAM.  Among other

19  things, the declaration explains that medical staff do temperature testing and symptom screening daily in

20  every housing unit.  *Id.* at ¶ 11.  The declaration further explains the resources available for treatment,

21  including an on-site Hospital Care Unit or, if intensive-care level services are needed, transfer to a local

22  hospital.  *Id.* at ¶ 8.

23         **IV.     LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE**

24         **A.      Compassionate Release Under the FSA**

25         A compassionate-release motion is a request for a permanent reduction in a defendant's federal

26  sentence.  A district court generally "may not modify a term of imprisonment once it has been imposed."

27  18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010).  Compassionate release

28  is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . .

impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]"  18 U.S.C. § 3582(c)(1).

Because this relief is both drastic and permanent, it is subject to strict statutory conditions.

First, a district court can evaluate a defendant's request for compassionate release only "after the defendant has fully exhausted all administrative rights" before the BOP.  Specifically:

> after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and jurisdictional.  *See generally Shaw v. Bank of America Corp.*, 946 F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion requirements deprive the court of jurisdiction"); *United States v. Weidenhamer*, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2 (D. Az. Nov. 8, 2019) (citing cases).

Second, in evaluating compassionate-release requests, courts must follow both the statute and relevant, binding policy statements.  *See id.*; 28 U.S.C. § 994(t); USSG § 1B1.13.  Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons, within the meaning of the statute; and (2) that s/he is not a danger to the community.  18 U.S.C. § 3582(c)(1)(A).  Specifically, the statute requires that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission"--in this case, USSG § 1B1.13.  *Id.*  As the Supreme Court recognized in *Dillon*, 560 U.S. at 827, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.

Section § 1B1.13 of the Sentencing Guidelines explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release.  *See* 28 U.S.C. § 994(t). They include, as relevant here, (1) a "terminal illness"; (2) a serious medical condition that "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment,

1  whichever is less." U.S.S.G. § 1B1.13 (other grounds omitted).  USSG § 1B1.13, comment. (n.1(A)-

2  (B)).  "[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for

3  purposes of this policy statement."  *Id.*, comment. (n.3).

4       Defendant bears the burden to prove both that he has "exhausted all administrative rights" and

5  that "extraordinary and compelling reasons" exist to support his/her motion.  18 U.S.C.

6  § 3582(c)(1)(A); *see United States v. Greenhut*, No. 18-CR-48-CAS, 2020 WL 509385, at *1 (C.D. Cal.

7  Jan. 31, 2020) (defendant bears the burden of establishing entitlement to sentencing reduction); *United*

8  *States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("defendant, as the § 3582(c)(2) movant, bears

9  the burden of establishing" eligibility); *see generally United States v. Butler*, 970 F.2d 1017, 1026 (2d

10 Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally

11 has the burden of proof as to that issue.").

12      Third, even for defendants who are statutorily eligible, compassionate release is a "rare" and

13 "extraordinary" remedy, within a district court's discretion to deny.  *United States v. Chambliss*, 948

14 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, 2020 WL 1291835, at *2–*3 (W.D.N.C.

15 Mar. 16, 2020).  Specifically, "it is a rare case in which health conditions present an 'exceptional

16 reason'" to allow for release where detention would otherwise be warranted.  *See, e.g.*, *United States v.*

17 *Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases); *accord United*

18 *States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) ("most courts treat compassionate release

19 'due to medical conditions [a]s ... a rare event.").  This reluctance to expansively apply compassionate

20 release is grounded in a concern that any less narrow application would yield significant sentencing

21 disparities.  *United States v. Ebbers*, --- F. Supp. 3d. ---, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

## V.    **ARGUMENT**

23      Babadjov's motion for a time-served sentence fails because he is not eligible for compassionate

24 release and, even if he were, the COVID-19 crisis does not justify a permanent reduction in his sentence.

### A.    **Babadjov Fails to Demonstrate an "Extraordinary and Compelling" Reason to Allow Release in His Case**

27      Babadjov's motion fails to carry his burden to establish his eligibility for compassionate release.

28 As the Third Circuit recently held, "[w]e do not mean to minimize the risks that COVID-19 poses in the

federal prison system," but the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison cannot independently justify compassionate release" – particularly given "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 2020 WL 1647922, at \*2.  Further, notwithstanding defendant's health condition, his potential for danger to the community makes him ineligible for compassionate release.

### 1.   Babadjov's health condition does not satisfy U.S.S.G. § 1B1.13.

"The First Step Act did not revise the substantive criteria for compassionate release"--criteria that is set forth in the Sentencing Commission's binding "policy statement," USSG 1B1.13. *Ebbers*, 2020 WL 91399, at \*4—\*5; 18 U.S.C. § 3582(c)(1)(A).  As courts have recognized, Congress intended that the "Sentencing Commission, not the judiciary, determine what constitutes an appropriate use of the 'compassionate release' provision." *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at \*2 (S.D. Ga. Dec. 10, 2019) (noting split in authority).  The Sentencing Commission's policy statement--USSG § 1B1.13--is thus binding on this Court.  *See Dillon*, 560 U.S. at 827; see, e.g., *United States v. Nasirun*, No. 8:99-CR-367, 2020 WL 686030, at \*2 (M.D. Fla. Feb. 11, 2020).

Thus, as noted above, a defendant seeking compassionate release must establish that his condition falls within one of the categories listed in the policy statement.  Those categories include, as relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  USSG § 1B1.13, comment. (n.1(A)).

The general threat of COVID-19--which poses a threat to every non-immune person in the country--does not satisfy these conditions.  "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 2020 WL 1647922 at \*2; *see also Eberhart*, 2020 WL 1450745 at \*2 ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").  To classify COVID-19 as an extraordinary and compelling reason, by itself, would be inconsistent with the text of the statute and the policy statement.  Moreover, it would have detrimental real-world effects: interfering with

BOP's organized anti-COVID-19 efforts, resulting in the inequitable treatment of inmates, and undercutting the strict criteria BOP employs to determine inmates' eligibility for sentence reductions and home confinement.  Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a viral pandemic.

Babadjov's medical records indicate that he is a healthy 35-year-old man. He is 5'9' and weighs 197 pounds, making his BMI 29.1.  *See* Exhibit 2 at 17 (Last recorded weight on October 1, 2018). *https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html*.  The CDC only recognizes "obesity with a BMI >30" as a high-risk factor for COVID-19 complication.  *See generally* Centers for Disease Control, Coronavirus Disease 2019 (COVID-19), People Who Are at Higher Risk, available at *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html*.  Obesity, as defined by the CDC, is a condition from which defendant "is not expected to recover," and which--in the presence of COVID-19--may be both "serious" and "substantially diminish[] the ability of the defendant to provide self-care" in a correctional environment.  USSG § 1B1.13, comment (n.1(A)(ii)(I)).  However, defendant has not met his burden to establish such a condition.

2.   Babadjov's continuing danger makes him ineligible for compassionate release.

Even if defendant had such a qualifying condition, serious illness is not the only requirement for compassionate-release eligibility; a defendant must also demonstrate that he is "not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Defendant cannot make that showing, and thus he is ineligible for a reduced sentence.

Specifically, this Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13; *see United States v. Gotti*, No. 02-CR-743, 2020 WL 497987, at *6 (S.D.N.Y. 2020) (release was inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public); *accord United States v. Urso*, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019); *United States v. Applewhite*, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-

old inmate based on danger).

The record here demonstrates that the defendant may pose a danger to the community if his sentence is reduced to time served.  His current crimes of conviction involved distributing some of the most dangerous drugs in existence—heroin and fentanyl. The defendant distributed those narcotics over an extended period of time (approximately 1 year) and indiscriminately distributed to customers throughout the United States. In addition, the defendant failed to comply with the Court's orders when he was initially released from custody pre-trial.  Specifically, when he was first arrested in December 2016, a Magistrate Judge in the Northern District of California ordered Babadjov released on a bond; just a few weeks later that court ordered him detained after failing to comply with the court's orders. *See* 3:16-mj-71647-MAG (N.D.Cal). Then, a few months later, in April 2017, a Magistrate Judge in the Eastern District of California granted bail on a $500,000 secured bond; only a month later the court had him arrested for failing to comply with the court's orders, specifically, continuing to use controlled substances.  Dock. No. 24.  In sum, Babadjov has shown that he has no regard for the court's orders and cannot be trusted to comply with those orders and general social norms.

In the current climate, irresponsible social habits also gravely endanger the community.  *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) ("community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  All California residents are currently required to shelter in place (although some restrictions are slowly easing) and to "heed the current State public health directives" to avoid the spread of COVID-19.  California Executive Order N-33-20 (March 19, 2020), available at *https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf*.

Finally, defendant's purported rehabilitation do not satisfy his burden.  The standard for compassionate release is not just whether someone has performed well in prison.  To the contrary, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  USSG § 1B1.13, comment. (n.3). Even being a "model inmate" does not warrant an "abrupt departure from [a defendant's] current sentence." *Applewhite*, 2020 WL 137452, at *2.  Moreover, because there is a significant difference between doing well in prison and doing well in society, this Court, in evaluating the danger posed by defendant, cannot ignore the nature and circumstances of the offense, defendant's ties to the community, and [his] criminal

1 history.  18 U.S.C. § 3142(g).  An examination of those factors weighs against a time-served sentence.

### 3.  Disciplinary Action

Babadjov was sanctioned for a March 2020 incident while in BOP custody.  On March 25, 2020, he was found guilty of a Code 112 violation for use of narcotics. Exhibit 3 (Inmate Disciplinary Date).  This is just another example of Babadjov's inability to comply with the rules.

### 4.  Even If Babadjov Were Otherwise Eligible, the 18 U.S.C. § 3553(a) Factors Do Not Support a Shorter Sentence.

Any compassionate-release decision – even for a statutorily eligible defendant – must also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  Those factors do not support his request for premature, permanent release.  They support his current sentence.

The facts of the case do not merit a reduction of defendant's sentence.  As detailed above, Babadjov was large-scale drug vendor who sold some of the most dangerous drugs in existence.  His sentence did not include any mandatory minimums and was fair for the seriousness of his conduct.

Considering how the BOP addressed COVID-19 generally, and how it addressed COVID-19 at USP Lompoc, specifically, Babadjov's circumstances are not sufficiently extraordinary and compelling to justify a modified sentence.  Babadjov's arguments totally overlook the BOP's ability to treat infectious disease.  Even chronic conditions "that can be managed in prison are not a sufficient basis for compassionate release."  *United States v. Ayon-Nunez*, No. 16-CR-130-DAD, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020).  The Court "cannot assume that the Bureau of Prisons will be unable to manage [any] outbreak or adequately treat [defendant] should it emerge at his correctional facility while he is still incarcerated."  *Gileno*, 2020 WL 1307108, at *4 (denying compassionate-release motion in COVID-19-related case involving a defendant who raised specific health concerns); *accord Shah*, No. 10-70-CJC, ECF No. 329, at 3.  By Babadjov's logic, such conditions would universally qualify convicted inmates for shorter sentences given the present pandemic.  That is not the case.  In the present pandemic, Babadjov's circumstances are closer to ordinary than "extraordinary" and granting him a sentence reduction would not satisfy the 18 U.S.C. § 3553(a) factors. Granting compassionate release would undermine the 18 U.S.C. § 3553(a) factors, resulting in an effective sentence of just 40-months – below the applicable Guidelines range and with no significant mitigating facts supporting such a drastic,

unwarranted sentence reduction.  Indeed, the law and specific facts of defendant's case do not support such a result.

**B.**   **18 U.S.C. § 3621(b) Gives the Bureau of Prisons Exclusive Authority to Designate the Place of the Prisoner's Imprisonment.**

Babadjov asks that the Court order his release from his sentence and transform the sentence into time served.  Docket No. 43 at 12, 26-30. Babajov's motion misconstrues the finality of a sentence, and which entity is charged with carrying out the sentence the Court imposes.  Once a Court imposes a sentence, the BOP has authority to designate inmates to a particular place of incarceration, and to determine for how long they will be designated at that particular place of incarceration.  Section 3621(b) specifically states "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment . . . [and] the Bureau may designate any available penal or correctional facility . . .  Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this subsection to determine or change the place of imprisonment of that person.  Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."  18 U.S.C. § 3621(b).

Other courts have held that they are precluded from compelling the BOP, under the First Step Act, to release a petitioner to home confinement because the decision to do so rests solely within the discretion of the Attorney General or the BOP.  *See United States v. Perez-Asencio*, No. 18CR3611-H, 2019 WL 626175 (S.D. Cal. Feb. 14, 2019); *Jones v. Woods*, 2:19CV61, 2019 WL 2754731, at *4 (M.D. Ala. June 4, 2019); *Marshall v. English*, 19-3113-JWL, 2019 WL 3252742 (D. Kan. July 19, 2019); *Burg v. Nicklin,* No. EP-19-CV-24-FM, 2019 WL 369153 at *3 (W.D. Tex. Jan. 29, 2019); *United States v. Curry*, No. 6:06-082-DCR, 2019 WL 508067 at *1 (E.D. Ky. Feb. 8, 2019).

## VI.   QUARANTINE REQUESTED

Should the Court be inclined to grant Babadjov's motion, the United States requests a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.  The government further requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions—including a

1  release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised

2  release.  *See* 18 U.S.C. § 3582(c)(1)(A).

3                                  **VII.**        **CONCLUSION**

4          For the reasons discussed above, the United States respectfully requests that the Court deny

5  Babadjov's motion for release from his sentence.

6

7   Dated:  July 6, 2020                                         McGREGOR W. SCOTT
                                                                  United States Attorney
8

9                                                      By:   */s/ Grant B. Rabenn*
                                                             GRANT B. RABENN
10                                                           Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28