HEATHER E. WILLIAMS (SBN 122664)
Federal Defender
JAYA C. GUPTA (SBN 312138)
Assistant Federal Defender
2300 Tulare Street, Suite 330
Fresno, California 93721
Telephone: (559) 487-5561
Facsimile: (559) 487-5950

Attorneys for Defendant
EMIL VLADIMIROV BABADJOV

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. 1:16-cr-00204-1-LJO |
|---|---|---|
| Plaintiff, | ) ) | REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) |
| v. | ) ) | |
| EMIL VLADIMIROV BABADJOV, | ) ) | |
| Defendant. | ) ) ) ) | |

Mr. Babadjov submits this Reply in support of his Motion for Compassionate Release. As discussed below, Mr. Babadjov's underlying medical conditions coupled with the risks presented to him by COVID-19, and its unmitigated spread at FCC Lompoc constitute serious medical conditions from which he is not expected to recover and which substantially diminish his ability to provide self-care in the correctional setting. Further, notwithstanding the government's multitude of attempts to portray Mr. Babadjov as a danger to the community, Mr. Babadjov does not pose a risk to others. Thus, because "extraordinary and compelling reasons" exist under 18 U.S.C. § 3582(c), because Mr. Babadjov does not pose a danger to the community, and because the factors set forth in 18 U.S.C. §3553(a) support sentencing Mr. Babadjov to time served, this Court should grant his Motion for Compassionate Release and sentence him to time served or

alternatively amend his conditions of supervised release to require him to serve the remaining 28 months of his 70-month term in home confinement.

## ARGUMENT

**A. Notwithstanding the Government's Claim to the Contrary, Mr. Babadjov Has Demonstrated that There Are Extraordinary and Compelling Reasons Justifying Compassionate Release**

Contrary to the government's suggestion, Mr. Babadjov does not argue that the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison" warrants compassionate release. (*See* Opp. at 11-12.) Rather, Mr. Babadjov has shown that he faces a particularized, concrete risk of severe illness and/or death based on conditions he suffers (obesity and significant history of drug use), the conditions he is living in, and the unmitigated spread of COVID-19 at FCC Lompoc. The government's citation to dicta—not a holding as it claims—from *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), is unavailing to its argument. *Raia* concerned a motion for compassionate release considered in the first instance with the Third Circuit Court of Appeals, where the defendant essentially bypassed both the Bureau of Prisons ("BOP") and the district court in seeking relief.[1] *Id*. at 595. The Third Circuit denied the defendant's motion because the defendant had not fulfilled the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A) by giving BOP a chance to respond to his request for home confinement. Given that the government concedes that Mr. Babadjov has satisfied the exhaustion requirement here (Opp. at 5), its reliance on dicta from *Raia* does little to advance its argument.

Further, notwithstanding the Third Circuit's language about the insufficiency of the "mere" existence of COVID-19 to justify compassionate release, *Raia* did not involve a defendant asking for compassionate release "merely" because of the existence of COVID-19.

---

[1] *Raia* involved a unique procedural posture wherein the defendant had submitted a request to BOP for home confinement but did not wait 30 days before filing his motion for compassionate release. When he did file his motion, he filed it first with the district court, but the district court dismissed the motion for lack of jurisdiction because the government's appeal of the defendant's sentence was currently pending. The defendant then filed his motion with the Court of Appeals instead of appealing the district court's dismissal order. *Id.* at 595-96. As a result, neither BOP nor the district court had acted on the merits on Mr. Raia's request.

The Third Circuit noted that the district court would have granted his motion for compassionate release and released him precisely because he had shown a particularized, concrete risk of severe illness and/or death from COVID-19. *Id*. at 596. The district court reasoned that because Raia was 68 years old and suffered from diabetes, both of which are CDC-recognized risk factors, in addition to suffering from Parkinson's Disease and heart conditions, it would have reduced his sentence to home confinement "due to the increased risk posed by a custodial term" in light of COVID-19 and because Raia's offense was "non-violent and [Raia] has otherwise been a highly productive, charitable member of his community." *Id*.. The district court could not have granted Mr. Raia's request for compassionate release because the government's appeal had divested it of jurisdiction. Thus, this dicta from *Raia* divorced from its context is utterly unavailing to the government's position.

Turning to the merits, the government contends that there are no extraordinary and compelling circumstances warranting compassionate release because Mr. Babadjov does not suffer from a "serious medical condition." The government claims that Mr. Babadjov is not obese because his body mass index ("BMI") from nearly *two years ago* was slightly under the threshold for obesity. It altogether fails to address whether Mr. Babadjov suffers from a "serious medical condition" because of his history of substance use. Because Mr. Babadjov's *current* BMI based on his current height and weight makes him obese, and because Mr. Babadjov has a significant history of substance use, he is at a high risk of suffering severe illness and/or dying from COVID-19 if he were to contract it while incarcerated. These are an extraordinary and compelling reason justifying granting Mr. Babadjov compassionate release.

        **1.**      **Mr. Babadjov Has Shown that He Is Obese Based on His Current Height and Weight, and Therefore Suffers from a "Serious Medical Condition"**

Even though the government concedes that obesity is a "serious" medical condition from which a person "is not expected to recover" and which substantially diminishes a defendant's ability to provide self-care in the correctional setting, and thus is an "extraordinary and compelling reason" justifying compassionate release (Opp. at 13), the government contends that

Mr. Babadjov does not meet the criteria for obesity and therefore does not qualify for compassionate release. Specifically, the government argues that Mr. Babadjov is not obese because his weight taken by BOP on October 1, 2018 reflects that his BMI at that time was 29.1, which just under the threshold criteria for obesity, which is a BMI of 30 or more. (Opp. at 13.) Notably, the government does not otherwise dispute that Mr. Babadjov's weight as of *today* is 205 to 210 lbs. Thus, the government's argument hinges on this Court crediting outdated data from nearly two years ago instead of crediting more recent data proffered by Mr. Babadjov as to his current weight.

The court, however, should credit the evidence proffered by Mr. Babadjov that his current weight falls between 205 and 210 lbs. Not only is this data more recent, it is undisputed by the government. Contending that Mr. Babadjov's weight in October 2018 was 197 lbs. does not dispute that his weight is 205 to 210 lbs. now. Further, Mr. Babadjov has no incentive to falsify his weight when he knows that it could easily be disproved and that this Court would almost certainly deny his motion compassionate release if it were discovered that he was lying about his weight.[2] Additionally there is not a drastic difference between Mr. Babadjov's PSR weight of 200 lbs., his October 2018 weight of 197 lbs. and his current weight of 205 to 210 lbs. Further, it makes more sense that Mr. Babadjov's weight would be increasing rather than decreasing while in custody from the time of his PSR when Mr. Babadjov are other inmates are provided with unhealthful meals and when prisoners are confined to their small cells 24 hours a day and are only allowed out three times a week for an hour to shower, use phones and send emails.

Nor should this Court be more persuaded by the form of the government's proffer – Mr. Babadjov's BOP maintained medical records from 2018 – over Mr. Babadjov's – through a declaration of undersigned counsel. Mr. Babadjov has no control over if or when BOP measures his weight and documents it in his medical records. If anything, the fact that BOP has not measured and documented his weight since October 2018 speaks to BOP's inadequate medical care. Thus, this Court should credit the recent evidence proffered by Mr. Babadjov as to his

---

[2] It is worth pointing out that this issue of fact could easily be resolved if BOP simply took Mr. Babadjov's most recent weight.

current weight. And because his current weight makes him obese, which the government concedes is a "serious" medical condition from which a defendant is not expected to recover, and in the presence of COVID-19, "substantially diminishes the ability of the defendant to provide self-care" in the correctional environment, this Court should find that Mr. Babadjov suffers from a "serious medical condition," which is an extraordinary and compelling reason justifying compassionate release.

### 2. Mr. Babadjov Also Suffers from a Serious Medical Condition Given His History of Drug Use

The government altogether fails to address and therefore concedes the risks posed to Mr. Babadjov because of his history of drug use in the face of the COVID-19 pandemic, as discussed in detail in the Supplement to Mr. Babadjov's Motion for Compassionate Release. Mr. Babadjov has a very significant history of past substance use that includes smoking marijuana, smoking methamphetamine, and injecting methamphetamine for decades. (PSR at ¶¶ 54-59.) Those with a history of smoking marijuana are vulnerable because it adversely affects an individual's respiratory and pulmonary function, which may worsen COVID-19 complications like acute respiratory distress syndrome (ARDS).[3] Similarly, a history of methamphetamine use also puts individuals at risk because "[m]ethamphetamine constricts the blood vessels, which is one of the properties that contributes to pulmonary damage and pulmonary hypertension in people who use it."[4] Methamphetamine use also contributes to local immune dysregulation, and alters the expression of certain enzyme receptors that are key sites for COVID-19 to bind in the lungs and

---

[3] Dr. Nora Volkow, *COVID-19: Potential Implications for Individuals with Substance Use Disorders*, National Institute on Drug Abuse (Apr. 6, 2020), https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders; *Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (describing individuals with lung disease and serious heart conditions as those at high-risk for severe illness from COVID-19) (last accessed June 1, 2020).

[4] Dr. Nora Volkow, *COVID-19: Potential Implications for Individuals with Substance Use Disorders*, National Institute on Drug Abuse (Apr. 6, 2020), https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders.

small intestine.[5] In light of these undisputed risks, and Mr. Babadjov's history of marijuana and methamphetamine use, Mr. Babadjov suffers from a "serious medical condition" within the meaning of the Sentencing Commission's policy statement. There are, thus, "extraordinary and compelling reasons" justifying granting Mr. Babadjov compassionate release.

### 3. BOP Has Failed to Adequately Address and Manage the COVID-19 Crisis, and Therefore Mr. Babadjov Remains At Risk.

The government claims that BOP has "taken aggressive steps to protect inmates' and employees' health and to keep COVID-19 outside of its facilities." (Opp. at 5-7.) The hundreds of people who have been infected while incarcerated at FCC Lompoc and the dangerous conditions in which prisoners are still living tell an entirely different story.

As a threshold matter, it is important to note that at no point does the government dispute Mr. Babadjov's description of the living conditions while at USP Lompoc or explain how those conditions comport with guidelines issued by the Centers for Disease Control, which the government claims that BOP is following. (Opp. at 6.) Perhaps most concerning is the government's failure to dispute the report that staff members are not being tested to ensure that they are not introducing COVID-19 into the facilities. Instead of addressing the specific problematic conditions that Mr. Babadjov reports, the government resorts to generalizations about the various policies and Phases of operation that the BOP has allegedly implemented in its attempt to contain the COVID-19 outbreak at its facilities. The conditions on the ground, however, do not match the picture the government paints.

For example, the government claims that as part of Phase 8, which is an extension of Phase 7, that BOP would minimize all movement to stop the spread of the virus. Yet in the time that Mr. Babadjov filed his Supplement and this Reply, he has received confirmation that he will be transferred tomorrow (July 14, 2020) from USP Lompoc where he resided in an open-bar cell in Unit M to Unit J at FCI Lompoc. Unit J is an open plan dorm that previously housed hundreds

---

[5] Carrico, A. W., Horvath, K. J., Grov, C., Moskowitz, J. T., Pahwa, S., Pallikkuth, S., & Hirshfield, S. (2020). *Double Jeopardy: Methamphetamine Use and HIV as Risk Factors for COVID-19*. AIDS and behavior, 1–4. Advance online publication. https://doi.org/10.1007/s10461-020-02854-w (last accessed June 1, 2020).

of prisoners who had been diagnosed as COVID-19 positive. Indeed, one of undersigned counsel's other clients, Jack Mootz, who tested positive for COVID-19, resided in his very dorm before he was moved to make room for prisoners like Mr. Babadjov. *See United States v. Mootz*, No. 1:17-cr-00053-DAD, ECF No. 56 (E.D. Cal.). It is not known whether Unit J has been or will be disinfected before Mr. Babadjov moves in.

While the government contends that BOP "has continued working with the CDC, confirming that its approach aligns with current CDC guidance for COVID management in correctional facilities[,]" Mr. Babadjov set forth in his Supplement how the conditions in Unit M failed to meet CDC guidelines for correctional facilities, recommending implementing social distancing to increase physical space between prisoners regardless of the presence of COVID-19 symptoms, ensuring there is a sufficient stock of hygiene supplies, cleaning supplies, and PPE, and providing a no-cost supply of soap and hand sanitizer to prisoners. His new housing in Unit J similarly fails to meet those same guidelines. The capacity of Unit J is 228 people, sleeping in114 bunks that are spaced approximately two to three feet apart. There are no partitions that separate the bunks. The prisoners living in Unit J with Mr. Babadjov will share a limited number of showers, toilets, and urinals. Thus, social distancing and self-isolation will be impossible. Further, as Mr. Mootz relayed in his Emergency Motion for Compassionate Release, other prisoners in Unit J and stuff who entered Unit J did not wear marks or other personal protective equipment when social distancing was not possible. While BOP informed Mr. Mootz that he would be receiving hand sanitizer, towels, and cleaning supplies, he never received any of those things. Mr. Babadjov reported that the only cleaning supplies he received while in Unit M was a bar of lye soap a week.

These reports demonstrate that notwithstanding BOP's plans and policies for attempting to contain the COVID-19 crisis, those plans and policies are not being adhered to and therefore are not protecting vulnerable individuals like Mr. Babadjov from contracting COVID-19. Given Mr. Babadjov's vulnerability to severe illness and/or death from COVID-19, "extraordinary and compelling reasons" exist justifying granting Mr. Babadjov compassionate release.

**B. Mr. Babadjov Categorically Is Not and Never Has Been a Danger to Society**

Next, the government provides a litany of supposed reasons that Mr. Babadjov "may" pose a danger to the community and therefore is ineligible for compassionate release. None of these purported reasons demonstrate that Mr. Bababdjov is violent or poses a danger. Instead they reveal a young man who committed an offense to support a drug habit and who has struggled mightily to overcome an addiction that has plagued him for decades. Despite the herculean effort it has taken, Mr. Babadjov has put in the work and finally beat his addictions. Mr. Babadjov was not a danger when then he committed the offense, and he is not a danger now.

First, the government points to Mr. Babadjov's "crimes" of conviction. Mr. Babadjov was convicted of a single crime, distribution of a controlled substance. Not only is distribution of a controlled substance not a crime of violence, the facts of the offense do not involve any allegations of violence and there were no identified victims. *See United States v. Jones*, Nos. 13-cr-577, 16-cr-33, 2020 WL 3892960, at *7 (E.D. Pa. Jul. 9, 2020) (granting defendant's motion for compassionate release, finding that the defendant did not pose a danger to the community because defendant's offenses for conspiracy to distribute and distributing oxycodone, aiding and abetting, acquiring controlled substances by fraud, and money laundering were "non-violent and do not suggest he is a danger to the community," because the offenses did involve allegations of violence in their commission, and because the defendant had completed the 500-hour RDAP program.)

Further, none of the cases cited by the government establish that a conviction for distribution of controlled substances for approximately a year means one poses a danger to society. (*See* Opp. at 13.) If anything, cases cited by the government establish the opposite. *See, e.g.*, *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (deferring to the trial court's finding that the defendant was not a danger to the society even though he had been convicted of trafficking a substantial amount of methamphetamine, was a "career offender," and had a prior armed robbery conviction).

Next, the government argues that Mr. Babadjov distributed the "most dangerous drugs in existence—heroin and fentanyl[,]" distributed those drugs for an "extended period of time[,]" and

"indiscriminately distributed to customers throughout the United States." Mr. Babadjov does not deny that he distributed limited quantities of heroin, fentanyl, and methamphetamine. He, however, distributed those drugs for approximately year, which is a relatively brief period of time. Further, government completely overlooks and consequently fails to address the impetus of the crime: Mr. Babadjov was addicted to those same drugs and distributed them for the sole purpose of fueling his all-consuming addiction, an addiction so bad that it almost killed him several times. Mr. Babadjov did not intend to harm anyone, did not want to live the way he was living, and actively wanted to change "to be someone my family can be proud of." (PSR at ¶ 21). Courts have found that defendants who commit offenses while battling drug addiction do not present danger to the community and have granted compassionate release even where they have committed offenses far more serious than Mr. Babadjov's offense and/or have significant criminal histories. In *United States v. McRae*, No. 10-cr-0127-PJM, 2020 WL 3791983, at *5 (D. Md. July 7, 2020), for example, the district court granted the defendant's motion for compassionate release after he had served 110 months in prison for a conviction for bank robbery. Notwithstanding the defendant's conviction for a crime of violence, and the fact that the defendant had a lengthy criminal history which included robbery with a deadly weapon, second degree assault and theft, the court found the defendant not to be a danger to the community because "his past crimes were mostly limited to a period of time when he had issues with drugs," and because he had support from his family. *Id*.

The government next argues that Mr. Babadjov's struggles while on pretrial release leading to his detention shows that "he has no regard for the court's orders and cannot be trusted to comply with those orders and general social norms." Mr. Babadjov does not dispute that he struggled while on pretrial release. Once again, however, the government overlooks that Mr. Babadjov was struggling with an addiction. He has dealt with that addiction and the original impetus for the crime by completing the RDAP program. While Mr. Babadjov sustained a disciplinary infraction while incarcerated, this was his first and only infraction is more than 42 months of custody. Further, because of his pretrial detention, Mr. Babadjov is well aware that if he does not abide by the conditions of his supervised release if he is granted compassionate

release, he will be returned to custody. *See United States v. Quintero*, --- F.Supp.3d ---, 2020 WL 2175171, at *2 (W.D.N.Y. May 6, 2020) (granting compassionate release notwithstanding several prior sentences and a violation of supervised release).

The government next argues that Mr. Babadjov will not abide by shelter in place order in place in California. (Opp. at 14.) There is absolutely zero evidence that this will be the case. Mr. Babadjov has every incentive to abide by this order given his vulnerability to COVID-19 given his underlying medical conditions.

Finally, the government discounts the rehabilitation that Mr. Babadjov has undergone, and suggests that Mr. Bababdjov's only basis for seeking compassionate release is because he has been a model inmate. Once again, and as explained above, Mr. Babadjov is not seeking compassionate release simply because he has undergone rehabilitation and has exhibited exemplary behavior while incarcerated. He is seeking compassionate release because he faces a particularized, concrete risk of severe illness and/or death from COVID-19 given his underlying medical conditions. That he has completed RDAP and has been a model inmate apart from his one disciplinary infraction only adds to the reasons why the factors set forth in 18 U.S.C. § 3553 support granting Mr. Babadjov compassionate release.

And contrary to the government's argument, the § 3553(a) do support granting compassionate release. As to the nature and circumstances of the offense, and the history and characteristics of the defendant, this was a first-time, non-violent crime, committed entirely to support an addiction. Mr. Babadjov was otherwise a productive member of society, earning a college degree, and being gainfully employed.

As to the remaining factors, Mr. Babadjov does not dispute that his sentence was fair considering his offense. He, however, has served 42 months or 60% of that 70 month sentence, and an even greater percentage considering good conduct time. This is sufficient, but not greater than necessary to accomplish the objectives of sentencing. The government mistakenly contends that Mr. Babadjov has only served 40 months. (*See* Opp. at 4.) This is based on the outdated computation from May 22, 2020 that the government attached to its Opposition. *See* ECF No. 48-1 at 4. The computation attached to Mr. Babadjov's Supplement is as of June 1, 2020 and

thus more up to date. By the time Mr. Babadjov filed his Supplement on June 26, he had served approximately 3 years, 5 months, and 15 days, or nearly 42 months. As of today's date, July 13, 2020, Mr. Babadjov has served approximately 3 years, 6 months, and 2 days or more than 42 months. The government is thus wrong that Mr. Babadjov has only served 40 months. The substantial amount of time that Mr. Babadjov has served reflects the seriousness of the offense, promotes respect for the law, is just punishment for the offense, affords adequate deterrence, and has protected the public from any further crimes as Mr. Babadjov has used this time to overcome his addiction. The time served has also provided Mr. Babadjvo with needed drug treatment.

Thus, because Mr. Babadjov does not present a danger to the community and the factors set forth in § 3553(a) support reducing Mr. Babadjov's sentence to time served, this Court should grant his Motion for Compassionate Release and re-sentence Mr. Babadjov to time served, and if necessary, amend his conditions of supervised release to serve the remainder of his custodial term in home confinement.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Mr. Babadjov's original motion and Supplement, Mr. Babadjov asks this Court to grant his motion for compassionate release pursuant to 18 U.S.C. § 3582 and reduce his sentence to time served, or alternatively, amend the conditions of supervision to require him to serve what would have been the remaining portion of his custodial term in home confinement.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Dated: July 13, 2020

/s/ Jaya C. Gupta
JAYA C. GUPTA
Assistant Federal Defender

Attorneys for Defendant
EMIL VLADIMIROV BABADJOV